**Opinion issued October 31, 2013**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00848-CV

_____

### THE CITY OF TEXAS CITY, Appellant

### V.

### EDITH SUAREZ, INDIVIDUALLY AND AS SURVIVING PARENT OF AS AND SS, DECEASED, AND AS SURVIVING SPOUSE OF HECTOR SUAREZ, DECEASED, Appellee

---

**On Appeal from the 212th District Court**
**Galveston County, Texas**
**Trial Court Case No. 11CV1108**

---

## OPINION DISSENTING FROM DENIAL OF EN BANC REVIEW

I respectfully dissent. As the panel opinion states, this wrongful death and survival case arises from the drowning deaths of nine-year-old twin girls, AS and

SS, and their father, Hector Suarez, in Galveston Bay at a recreational area owned and operated by the City of Texas City. Edith Suarez, the twins' mother and Hector's wife, filed suit against the City asserting wrongful death and survival claims. She alleged that the City was negligent and grossly negligent in failing to warn of dangerous hidden undertows and rip currents in the waters of a partly submerged beach constructed by the City next to the Dike of the City of Texas City ("the Dike") and opened by the City to the public for recreational purposes—rip currents that caused the deaths of Suarez and his daughters, who had gone to the beach for a picnic and swimming and had paid the City's entrance fee to use the beach.

The City filed a plea to the jurisdiction asserting that Suarez's claims should be dismissed because they are barred by governmental immunity. The trial court denied the plea, and the City filed this interlocutory appeal. The panel reversed the trial court's order denying the City's plea to the jurisdiction and rendered judgment dismissing Suarez's claims. The en banc court has denied review.

I believe this wrongful death and survivor case, arising from hidden hazards on a manmade beach owned by the City and operated for recreational use sets precedent in this Court that is contrary to established law on three important issues:

(1) the opinion's construction of the waiver of immunity provisions of the Texas Tort Claims Act, as restricted by Texas's Recreation Use Statute with respect to a wrongful death and survivor action predicated on

2

premise liability, effectively bars all premise liability claims on governmentally owned and maintained premises used for recreation;

(2) it effectively reinstates for this Court prior law expressly abrogated by the Texas Supreme Court; and

(3) it reverses the standard of review of pleas to the jurisdiction, accepting all of the *movant*'s evidence of the City's lack of knowledge of hazardous conditions, hence lack of gross negligence, as true, while discounting all of the *nonmovant*'s evidence of gross negligence as *no* evidence.

"I recognize that [e]n banc consideration of a case is not favored and should not be ordered unless necessary to secure or maintain uniformity of the court's decisions or unless extraordinary circumstances require en banc consideration." TEX. R. APP. P. 41.2(c). Here, however, I believe that extraordinary circumstances require en banc review.

I would grant en banc review and would hold that Suarez produced jurisdictional evidence from which the trial court, the trier of jurisdictional facts, could reasonably have concluded that the City's actions in rebuilding the manmade beach after Hurricane Ike greatly enhanced the already extreme danger of hidden undertows and rip currents close to shore on the submerged beach and that the City was grossly negligent in failing to conduct safety studies, in failing to warn of the danger, and in charging the public to use the beach for picnicking, swimming, and wading when the beach was not fit for those purposes. Therefore, I would hold that the trial court did not err in holding that the City's immunity to the wrongful death and survivorship claims of plaintiff Edith Suarez, individually and as

3

surviving parent of A.S. and S.S., deceased, and as surviving spouse of Hector Suarez, deceased, was waived by the premise liability exception to the Texas Tort Claims Act as modified by the Recreational Use Statute. I would affirm the trial court's denial of the City's plea to the jurisdiction, and I would remand the case for trial on the merits.

**Plea to the Jurisdiction**

### A. Standard and Scope of Review

A plea to the jurisdiction seeks to dismiss a case for want of jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). When reviewing whether a plea was properly granted, we first look to the pleadings to determine if jurisdiction is proper, construing them liberally in favor of the plaintiff and looking to the pleader's intent. *Id.* at 226. The allegations found in the pleadings may affirmatively demonstrate or negate the court's jurisdiction. *Id.* at 226–27. "However, if a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised," even when those facts may implicate the merits of the cause of action. *Id.* at 227. "[I]f the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 228. However, if the evidence creates a fact question as to the jurisdictional issue,

jurisdiction is for the fact-finder to decide. *Id.* at 227–28. In considering the jurisdictional evidence, we "take as true all evidence favorable to the nonmovant" and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* at 228.

## B.    Governmental Immunity

Generally, the doctrine of governmental immunity protects political subdivisions, such as cities, from suit and liability. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003). Immunity from suit, as distinguished from immunity from liability, deprives a trial court of subject matter jurisdiction unless the government has consented to being sued. *Miranda*, 133 S.W.3d at 224; *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). The governmental entity's consent to suit allows the trial court to exercise jurisdiction over the lawsuit. *See Jones*, 8 S.W.3d at 638. A plaintiff bears the burden to affirmatively demonstrate a trial court's jurisdiction by alleging a valid waiver of immunity, which may be either by a reference to a statute or by express legislative permission. *Id.*

### 1. Texas's Wrongful Death Statute

Suarez brought her claims pursuant to Texas's Wrongful Death Statute, which provides, "A person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or

5

servant's wrongful act, neglect, carelessness, unskillfulness, or default." TEX. CIV. PRAC. & REM. CODE ANN. § 71.002(b) (Vernon 2008). The statute defines "person" to mean "an individual, association of individuals, joint-stock company, or corporation or a trustee or receiver of an individual, association of individuals, joint-stock company, or corporation." *Id.* § 71.001(2) (Vernon 2008). The statute further defines "corporation" to include a municipal corporation; that is, a city. *Id.* § 71.001(1). The Wrongful Death Statute is not sufficient, by itself, however, to waive a city's immunity to suit. To waive immunity, a statute must contain a clear and unambiguous expression of waiver. *Rolling Plains Groundwater Conservation Dist. v. City of Aspermont*, 353 S.W.3d 756, 759 (Tex. 2011) (citing TEX. GOV'T CODE § 311.034 (Vernon 2011) and *Taylor*, 106 S.W.3d at 696).

The Wrongful Death Statute expressly states that it applies only if the individual injured would have been entitled to bring an action for the injury if the individual had lived. TEX. CIV. PRAC. & REM. CODE ANN. § 71.003(a) (Vernon 2008). Here, AS, SS, and Hector Suarez would have been entitled to bring an action against the City if they had lived if they first showed either (1) that the City was performing a proprietary function in operating the manmade beach as a recreational facility or (2) that, even though the City was performing a governmental function in operating the manmade beach, its immunity from suit was waived by its actions. *See Miranda*, 133 S.W.3d at 224–25 (discussing

6

waiver of immunity in Texas Tort Claims Act).  Because I believe the City's immunity to Suarez's claim for damages is waived by Tort Claims Act[1] section 101.021(2), governing premise liability, as modified by Texas's Recreational Use Statute,[2] even if the City's operation of the beach is a governmental function, I would not address Suarez's argument that the City's operation of the beach is a proprietary function.

### 2.  *Texas's Tort Claims Act and Recreational Use Statute*

Suarez contends that the dangerous condition of the Texas City manmade beach created a duty of ordinary care on the part of the City either to warn of the condition or to make the beach reasonably safe for use as a recreational facility; that is, she raises a premise defect claim against the City.  Suarez claims that the Tort Claims Act waives immunity for wrongful death caused by a premise defect.  She further argues that, even if the Recreational Use Statute restricts the duty owed by a governmental entity for premise liability to the duty owed to a trespasser, rather than an invitee or licensee, and even if it restricts the Tort Claims Act's waiver of the governmental entity's immunity for its actions to acts that are wanton and willful or grossly negligent, the City's immunity to her claims is waived under

---

[1]     *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109 (Vernon 2011 & Supp. 2012).

[2]     *See id.* §§ 75.001–.003 (Vernon Supp. 2011 & Supp. 2012).

7

controlling Texas Supreme Court law because the City acted with gross negligence. I agree.

The Tort Claims Act provides a limited waiver of governmental immunity from suit for certain tort claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.021, 101.025 (Vernon 2011). The Act includes, among other things, a limited waiver of the state's immunity from suits alleging personal injury or death caused by premise defects.[3] *Id.* §§ 101.021(2), 101.022 (Vernon 2011); *City of Dallas v. Giraldo*, 262 S.W.3d 864, 869 (Tex. App.—Dallas 2008, no pet.).

Section 101.022 of the Tort Claims Act provides, in relevant part:

> [I]f a claim arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises.

TEX. CIV. PRAC. & REM. CODE § 101.022(a).

For the Tort Claims Act's limited waiver of sovereign immunity for a premise defect to apply, the plaintiff must prove: (1) the condition of the premises

---

[3]   Suarez also alleged in her petition that her claim, in part, arose from a special defect in addition to a premise defect. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(b) (Vernon 2011). Whether a condition is a premise defect or a special defect is a question of law for the court to decide. *City of Dallas v. Giraldo*, 262 S.W.3d 864, 869 (Tex. App.—Dallas 2008, no pet.). "Special defects" under the Tort Claims Act are "excavations or obstructions on highways, roads, or streets." *Id.* at 870. I would hold that, as a matter of law, Suarez's claim is not a special defect claim but a premise defect claim. *See City of Dallas v. Reed*, 258 S.W.3d 620, 622 (Tex. 2008) ("Special defects are defects of the same kind or class as 'excavations or obstructions on highways, roads, or streets.'").

created an unreasonable risk of harm to the licensee or invitee; (2) the owner failed to exercise ordinary care to protect the licensee or invitee from danger; and (3) the owner's failure was a proximate cause of injury to the licensee or invitee. *Giraldo*, 262 S.W.3d at 869. A premise defect claim is based on the property itself being unsafe. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006).

In premise defect cases, the governmental unit owes "only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises" in which case the duty owed is that owed to an invitee. TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(a); *Shumake*, 199 S.W.3d at 283 & n.3; *see City of Irving v. Seppy*, 301 S.W.3d 435, 441 (Tex. App.—Dallas 2009, no pet.); *Garcia v. State*, 817 S.W.2d 741, 742 (Tex. App.—San Antonio 1991, writ denied). A personal injury claimant alleging a premise defect claim against a city with respect to a licensee must plead and prove either (1) that the city's conduct was "willful, wanton, or grossly negligent" or (2) that "the city had actual knowledge of the dangerous condition, the claimant did not, and the city failed to warn of the condition or make the condition reasonably safe." *City of Weston v. Gaudette*, 287 S.W.3d 832, 836 (Tex. App.—Dallas 2009, no pet.); *see Tex. S. Univ. v. Gilford*, 277 S.W.3d 65, 69–70 (Tex. App—Houston [1st Dist.] 2009, pet. denied) (holding that limited duty owed to licensee requires that landowner either warn licensee of, or make reasonably safe, dangerous condition of which

9

landowner has actual knowledge and licensee does not; but if plaintiff pays fee, duty owed is that of invitee and owner is required to reduce or eliminate unreasonable risk of harm created by premise condition of which owner is or reasonably should be aware) .

The Tort Claims Act modifies a governmental unit's waiver of immunity, however, in a premise liability case in which the plaintiff was injured while engaging in a recreational activity within the scope of the Recreational Use Statute. *Miranda*, 133 S.W.3d at 225 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.058 (Vernon 2011)); *see also* TEX. CIV. PRAC. & REM. CODE ANN. §§ 75.001–.003 (Vernon 2011 & Supp. 2012). In such a case, the Recreational Use Statute controls over the Tort Claims Act. TEX. CIV. PRAC. & REM. CODE ANN. § 75.003(g) (Vernon 2011) (providing that chapter 75 controls over chapter 101 to extent chapter 75 limits liability of governmental unit under circumstances in which governmental unit would be liable under chapter 101); *id.* § 101.058 (Vernon 2011) (providing same).

The Recreational Use Statute provides:

If an owner, lessee, or occupant of real property . . . gives permission to another to enter the premises for recreation, the owner, lessee, or occupant, by giving the permission, does not:

(1) assure that the premises are safe for that purpose;

(2) owe to the person to whom permission is granted a greater degree of care than is owed to a trespasser on the premises; or

10

(3) assume responsibility or incur liability for any injury to any individual or property caused by any act of the person to whom permission is granted.

TEX. CIV. PRAC. & REM. CODE ANN. § 75.002(c) (Vernon 2011).

Section 75.002(d) of the statute provides that subsection (c) "shall not limit the liability of an owner, lessee, or occupant of real property who has been grossly negligent or has acted with malicious intent or in bad faith." *Id.* § 75.002(d).

The statute's definition of "recreation" is a non-exclusive list of activities, including, inter alia, hunting, fishing, swimming, boating, camping, picnicking, hiking, nature study, "waterskiing and other water sports," and "any other activity associated with enjoying nature or the outdoors." *Id.* § 75.001(3).

Under section 75.002(c), when injury or death results on government-owned, recreational land, the Recreational Use Statute limits the governmental unit's duty to that owed by a landowner to a trespasser. TEX. CIV. PRAC. & REM. CODE ANN. § 75.002(c)(2), (f). Thus, the Texas Supreme Court has defined the duty owed by a government entity to a person who is injured or dies on government-owned recreational land as the duty "to refrain from injuring the trespasser 'willfully, wantonly, or through gross negligence.'" *Shumake*, 199 S.W.3d at 285 (quoting *Tex. Utils. Elec. Co. v. Timmons*, 947 S.W.2d 191, 193 (Tex. 1997)); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 75.002(d); *see also Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 659 (Tex. 2007) (holding

11

that section 75.002(d) "limits the landowner's liability by raising the plaintiff's burden of proof to that of gross negligence, malicious intent, or bad faith").

The Texas Legislature has defined gross negligence as an act or omission "which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others" and of which risk "the actor has actual, subjective awareness . . . but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." TEX. CIV. PRAC. & REM. CODE § 41.001(11) (Vernon 2008). This definition is used to determine waiver of immunity under the Recreational Use Statute. *See Flynn*, 228 S.W.3d at 660 (quoting statute); *Shumake*, 199 S.W.3d at 287 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 21 (Tex. 1994) (defining gross negligence for purposes of statute as "an act or omission involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of others."); *Miranda*, 133 S.W.3d at 225. Gross negligence, as applied under the Recreational Use Statute, involves two components: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless

12

proceed in conscious indifference to the rights, safety, or welfare of others. *Miranda*, 133 S.W.3d at 225.

The Supreme Court of Texas has explained: "[W]hat separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but [its] acts or omissions demonstrate that [it] did not care." *Louisiana–Pacific Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex. 1999); *see also City of Corsicana v. Stewart*, 249 S.W.3d 412, 414–15 (Tex. 2008) (holding that "actual knowledge" element of premise defect cause of action requires knowledge that dangerous condition existed at time of accident).

In *Shumake*, the Texas Supreme Court expressly abrogated a line of intermediate court of appeals' cases holding that the Recreational Use Statute does not permit a premise defect claim against the state. *Shumake*, 199 S.W.3d at 282. The court held that a landowner may not be held grossly negligent "for failing to warn of the inherent dangers of nature," but "a landowner c*an* be liable for gross negligence in creating a condition that a recreational user would not reasonably expect to encounter on the property in the course of the permitted use." *Shumake*, 199 S.W.3d at 288 (emphasis added). The supreme court quoted *Golding v. Ashley Cen. Irrigation Co.* for the proposition,

> If [] a landowner has knowledge of an uncommon, hidden peril or
> danger on the land that is not inherent in the use to which the land is

13

put and that would not be reasonably discovered or avoided by a trespasser, the landowner's failure to warn or guard against such a danger could amount to willful, wanton, or malicious inaction.

*Id.* (citing *Golding*, 902 P.2d 142, 134 (Utah 1994)).

The court also cited *City of Houston v. Cavazos* for the proposition that "knowledge that numerous people had drowned over a period of years at the same artificially created, but hidden, hazard without any action by city to warn or remedy the hazard was some evidence of gross negligence." *Id.* (citing *Cavazos*, 811 S.W.2d 231, 234–35 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd)). In that case, the City of Houston was found grossly negligent, supporting a suit for damages for wrongful death against the city by the parents of a child who had drowned in a city park. 811 S.W.2d 231, 232 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd). The child slipped and fell while wading along a concrete slab covered with a foot to a foot and a half of water in a city park behind Lake Houston Dam where people stood to fish. Although the water at the edge of the slab dropped off to a depth of fifteen feet, the drop-off could not be seen by people wading across the slab. The Cavazos family saw numerous people walking across the slab and assumed it was safe to cross. *Id.* The younger brother, who was crossing with his older brother and uncle, "slipped, fell, was carried into the deep water and drowned." *Id.* The expert witness for the Cavazos family testified that "despite the appearance of safety, the slab was extremely dangerous because of the

14

swift current running across it, the slippery nature of parts of the slab, and the inability to see the dramatic change in depth at the edge of the slab." *Id.*

Similarly, the claim in *Shumake* arose from the recreational use of a state park that resulted in the drowning death of a child swimming in a park river who was sucked underwater by a powerful undertow and trapped in a man-made culvert. *Id*. at 281. The supreme court held that the pleadings were sufficient to state a premise liability claims under the Recreational Use Statute, and thus, to waive the state's sovereign immunity. *Id.* at 288.

By contrast, in *Flynn*, decided a year after *Shumake*, the supreme court held that the plaintiff failed to meet the standard for establishing a premises liability on recreational premises. 228 S.W.3d at 659–60. In that case, the plaintiff bike rider sued for injuries sustained when she was hit by a stream of water from an oscillating sprinkler while riding her bike on a trail on a university campus, fell, and was injured. *Id.* at 655. The supreme court reiterated its holding in *Shumake* that "the recreational use statute does not foreclose premise defect claims, but rather limits the landowner's liability by raising the plaintiff's burden of proof to that of gross negligence, malicious intent, or bad faith." *Id*. at 659 (citing *Shumake*, 199 S.W.3d at 285–87). It emphasized that "gross negligence is not synonymous with negligence, but rather requires the existence of an extreme risk

of serious injury or death, evaluated both objectively and subjectively." *Id*. at 660 (citing *Shumake*, 199 S.W.3d at 287).

The court commented that the allegations failed to demonstrate "that the sprinkler presented an extreme risk," that the university "was aware of the risk," or that it "was consciously indifferent to the sprinkler's capacity to inflict serious injury." *Id.* Moreover, the plaintiff conceded that she was aware of the sprinkler before she encountered it, and "the recreational use statute does not obligate a landowner to warn of known conditions." *Id.* Thus, the plaintiff's "conclusory allegations" of gross negligence were not sufficient to meet the standard imposed by the Recreational Use Statute or to rebut the jurisdictional evidence attached to the university's motion to dismiss. *Id.*

Two years later, in *City of Waco v. Kirwan*, the supreme court further clarified the duty owed by a governmental entity as a landowner to a recreational user of the land. In *Kirwan*, a college student was sitting on a rock cliff watching boat races in a municipal park located in the City of Waco when the cliff collapsed beneath him, causing him to fall sixty feet to his death. 298 S.W.3d 618, 620 (Tex. 2009). The cliff was a naturally occurring cliff consisting of loose rock and natural cracks, and the city had not "altered, modified, or excavated the limestone cliff beyond the stone wall in front of the cliff," which had been constructed by the City. *Id.* A sign in front of the cliff stated, "FOR YOUR SAFETY DO NOT GO

16

BEYOND WALL." *Id.* The student had crossed the wall and was beyond the warning sign when he fell to his death. *Id.*

The supreme court held that the City of Waco retained its governmental immunity in connection with a premise liability claim brought by the student's mother based solely on the collapse of the naturally occurring cliff. *Id.* at 628–29. It stated that a landowner does not generally owe a duty "to protect or warn against the dangers of natural conditions on the land." *Id.* at 626. But it also emphasized what it was *not* holding, stating that "we do not hold that a party may never be liable for gross negligence related to a natural condition—under some circumstances not present in this case, a landowner may be liable." *Id.* at 627.

Acknowledging that it had "previously held that the recreational use statute imposes a duty with respect to artificially created conditions in many instances," the court stated, "we do not strive today to define which conditions are transformed from 'natural' to 'artificial' due to a landowner's modifications" because the facts of the case did not require such a distinction. *Id.* It also observed that "it is possible a duty may be imposed on a landowner who has undertaken affirmative acts related to natural conditions, such as recommending a certain area or assuring a patron as to the condition's safety." *Id.* The court then distinguished its earlier holding in *Shumake*, noting that the claims made in *Shumake*—where a nine-year-old girl was sucked into a manmade culvert by a strong undercurrent while tubing

17

in a state park and drowned—were not based on a naturally occurring condition, unlike the claims then at issue in *Kirwan*—where a student fell to his death from a naturally crumbling cliff beyond a wall he had been clearly warned not to pass. *Id.* at 622 (citing *Shumake*, 199 S.W.3d at 281, 288).

While the panel brings this case under the rule in *Kirwan*, I find very little, if any, difference between this case and *Shumake* and essentially no difference between this case and *Cavazos*. *See Shumake*, 199 S.W.3d at 281, 288 (holding that state's sovereign immunity was waived when child drowned after being sucked into manmade culvert by strong undercurrent while tubing in state park); *Cavazos*, 811 S.W.2d at 232 (affirming finding that city was grossly negligent in drowning death of child who fell while wading along water-covered concrete slab in city park behind Lake Houston Dam). I would hold, like the panel, that the Recreational Use Statute applies to limit the City's waiver of immunity under the Tort Claims Act for a wrongful death claim, like Suarez's, to a premise defect claim based on the City's gross negligence. But I would also hold, unlike the panel, that Suarez has clearly stated such a claim on the basis of the undisputed jurisdictional facts. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 75.002(c).

It is undisputed that the Suarez family entered the beach after paying a park entrance fee to the City to engage in recreation, specifically, picnicking at picnic tables provided by the City near the water, and enjoying the beach and the water.

18

The undisputed evidence showed that the beach had been opened for exactly those purposes and that the City charged a fee for those entering the recently reopened beach for recreational purposes after changes made to the land and water by the City after Hurricane Ike. The record also showed that the drowning deaths occurred less than one month after the reopening of the Dike following its nearly two-year closure. And the evidence also showed that the Suarez twins immediately entered the water in their street clothes upon arriving at the beach and were wading within ten feet of the shore when they were swept away by a virulent hidden rip current, as was their father when he attempted to rescue them. There were no signs at the manmade beach warning of dangerous rip currents and undertows there and elsewhere along the length of the Dike or warning of previous drowning deaths that had occurred before the hurricane.

In her petition, Suarez alleged that the City had actual knowledge of "dangerous currents and an unstable bottom." She also alleged that, "[b]ecause the area has been the subject of other drownings and swimming incidents, the [City], in the past put up signs giving warning of undertows, deep holes and areas where swimming was not allowed." Suarez also averred,

> There were dangerous currents and an unstable bottom that had been created through erosion, ship movements in the Houston ship channel and various weather conditions including hurricanes and storms over the years. In addition, there had been numerous drownings and swimming events to where [the City] knew dangerous conditions existed in the area where these drownings occurred.

19

She described the conditions created by the alteration of the beach as "a perfect storm of man-made and natural forces that converged in a way that does not occur anywhere else on the Texas Gulf Coast" to create extremely dangerous undertows.

In addition to evidence showing that, after Hurricane Ike, the Army Corps of Engineers had placed additional dredged sediment, or spoil, on the beach area, Suarez relied on the affidavit of her expert, William Worsham, to explain the unique perils existing at the beach. In his affidavit, Worsham stated, "The presence of tidal currents and wind-generated waves interacting with the manmade beach on the morning of October 3, 2010, caused water motion adjacent to the beach shoreline of a magnitude sufficient to cause beachgoers standing in shallow water to lose their footing." He further stated that dredged sediment placed on the beach by the Corp of Engineers, had made the submerged beach slippery. Worsham opined that the beach had a cuspate, or scalloped, surface that generated rip currents and that "[t]he [D]ike and manmade beach interacted with the waves and tidal currents naturally present to cause energetic breaking waves and stronger currents, each of which was highly variable in strength and direction." According to Worsham's expert testimony, "The breaking waves produced by this interaction were sufficient to cause young persons and adults to lose balance. The likelihood of losing balance increased rapidly in the surf zone, such that even water depths of less than two feet were capable of causing loss of balance."

20

The City's Manager of Public Works, Tom Kessler, likewise acknowledged in his deposition that there had been other drownings at the Dike before October 3, 2010, and that some had involved children. Nevertheless, Texas City Mayor Doyle testified in his deposition that the City had never conducted any type of analysis or risk assessment to determine whether there were dangerous currents that could affect swimmers at the beach area. Nor had the City commissioned any studies to determine the effect of the Dike on wave action or other naturally occurring conditions.

Suarez also pointed to evidence offered in the jurisdictional proceedings showing that, before Hurricane Ike, the City had erected signs at various locations on the Dike warning visitors to swim only in designated areas and cautioning them to beware of undertows and rip currents. But no evidence indicated that a warning sign had at any time before the hurricane been erected at the manmade beach that the City had just reopened, nor was there any evidence that any warning signs were placed at the manmade beach after the repairs were made and the beach reopened for recreational activities. Suarez alleged, "The presence of signs in some locations and not others is an indication that the City was aware of the danger of rip currents." Mayor Doyle, however, testified that he was not aware that the presence of the Dike created rip currents, and the evidence showed that Mayor

21

Doyle was the person who made the decision with respect to what signs should be erected and where they should be erected.

The panel discounts *all* of the foregoing evidence as *no* evidence of the City's gross negligence in failing to warn of dangerous hidden undertows, rip currents, and extreme risk of drowning, as it warned elsewhere on the beach along the Dike, where many drownings had occurred; or in failing to conduct any studies to ascertain whether its own activities in rebuilding the beach had augmented the danger; or in opening the beach to the public for picnicking and swimming knowing it had failed to take any steps to ascertain the effect of its actions on the extreme risk already posed by the natural currents or to warn or to make the beach safe for the recreational purpose for which it was intended. Rather, the panel takes *all* of the foregoing evidence as evidence of the City's *lack* of knowledge of the extreme risk of drowning caused by the dangerous hidden undertows and rip currents occurring all along the Dike and enhanced by its own activities—rather than as evidence of the City's knowledge of the risk and failure to ascertain the effect of its own activities on that risk and its nevertheless proceeding to open the beach to the public in conscious indifference to the fate of those who accepted its invitation to use the beach for recreational purposes.

The panel opines that rip currents are "naturally occurring marine hazards commonly found in the ocean," as if the City's actions in augmenting the beach,

22

restoring the Dike, and opening the beach to the public for picnicking and swimming were irrelevant, and that signs elsewhere warning of the rip currents were adequate to warn families who paid their money to enter the manmade beach to picnic and swim that they should *not* enter the water because of the extreme risk involved. *See City of Texas City v. Suarez*, No. 01-12-00848-CV, 2013 WL 867428, at *10 (Tex. App.—Houston [1st Dist.] Mar. 7, 2013, no pet. h.) (mem. op.). Indeed, the panel faults Suarez for failing to explain "how such warnings indicate that the City had actual knowledge of the uniquely perilous conditions, caused by a confluence of man-made and natural conditions, she alleged existed on the day of the drowning." *Id.* It observes that "no evidence indicated that a warning sign had at any time in the past been erected at the beach," and it construes this as evidence, not of the City's gross negligence in failing to warn of the danger there, but as evidence of the City's lack of knowledge of any danger from riptides at the beach. "In short," it concludes, "no reasonable inference may be drawn that the City had actual awareness of the alleged unique and perilous conditions present at beach at the time of the drownings based on its placement of signs warning of common marine hazards at other locations on the Dike more than two years before the drowning deaths in this case." *Id.* at *11.

The panel entirely disregards the supreme court's admonition in *Kirwan* that "we do not hold that a party may never be liable for gross negligence related to a

23

natural condition—under some circumstances not present in this case, a landowner may be liable." 298 S.W.3d at 627. It likewise disregards the supreme court's statement in *Kirwan* that, in *Shumake*, it had "held that the recreational use statute imposes a duty with respect to artificially created conditions in many instances" and its further statement that "a duty may be imposed on a landowner who has undertaken affirmative acts related to natural conditions, such as recommending a certain area or assuring a patron as to the condition's safety." *Id.* It even fails to recognize that, in this case, the governmental entity had *altered* the naturally occurring rip currents and undertows by adding spoils to an already manmade beach next to the Dike, just as, in *Shumake*, the city had altered the natural flow of water in the river by diverting it through a manmade culvert that created a powerful hidden undertow when the water was high. *See* 199 S.W.3d at 281. And it disregards the virtually identical conditions described in *Cavazos*, in which a child drowned after slipping on a water-covered concrete slab with a hidden fifteen foot drop-off that he was wading along at a popular fishing spot in a city-owned park next to a dam. *Cavazos*, 811 S.W.2d at 234–35. The supreme court in *Shumake* cited these conditions as supporting the gross negligence claim made by the child's survivors against the City. *See Shumake*, 199 S.W.3d at 288 (citing *Cavazos*, 811 S.W.2d at 234–35). The panel disregards all of these supreme court guidelines in applying the law to this case.

In my view, the panel's analysis is directly contrary to the analysis required to determine gross negligence for purposes of the Recreational Use Statute as set out in both statutory and case law. *See* TEX. CIV. PRAC. & REM. CODE § 41.001(11) (defining gross negligence as actor's acts or omissions which, when viewed objectively from standpoint of actor at time of occurrence, involve extreme degree of risk, considering probability and magnitude of potential harm to others and of which risk actor has actual subjective awareness but nevertheless proceeds with conscious indifference to rights, safety, or welfare of others); *Flynn*, 228 S.W.3d at 660; *Miranda*, 133 S.W.3d at 225.

Despite the testimony of the City's own city manager, Keasler, as to previous drownings and of Suarez's expert, Worsham, as to the dangers created by the City's own activities, the panel discounts all evidence of the City's knowledge of dangerous conditions at the manmade beach on the ground that "[t]he record contains no allegations or jurisdictional evidence that any drownings had been attributed to the unique conditions described by Worsham in his affidavit." *Suarez*, 2013 WL 867428, at *11. It also states that the record contained "affirmative evidence indicating that the City had no actual knowledge of the unique perils Suarez alleges existed at the beach at the time of the drownings." *Id.* The panel cites, in support of its opinion, the evidence showing that the City did not commission any studies to determine the effect of the Dike on wave action or

25

other naturally occurring conditions and Mayor Doyle's deposition testimony that the City had never conducted any type of analysis or risk assessment to determine whether there were dangerous currents that could affect swimmers at the beach area. It also cites the mayor's testimony that he was not personally aware that the presence of the Dike created rip currents and that he was the person who made the decision with respect to what signs should be erected and where they should be erected. The panel also cites evidence that the drowning deaths occurred less than one month after the reopening of the Dike following its nearly two-year closure as support for its conclusion that the City did not know of—and, critically, *was not grossly negligent in failing to ascertain*—the extreme risk of death from drowning when the beach was used for the purpose for which it was opened to the public.

After reviewing the jurisdictional evidence, the panel concludes that there was "no evidence that creates a factual dispute with regard to whether the City had actual knowledge or awareness of the alleged unique and dangerous property condition existing at the beach at the time of the drowning deaths of Suarez's family," and it states that "the record conclusively shows that the City did not have actual awareness of the unique peril." *Id.* at *12. It, therefore, holds "that Suarez cannot bring a valid gross negligence claim under the Recreational Use Statute; thus, the City's immunity from liability for that claim is not waived. As a result, the City's immunity from suit also remains intact." *Id.* I conclude exactly the

26

opposite. I am hard put to discern any difference between this case and *Shumake* and *Cavazos*, which are almost identical on their jurisdictional facts.

I read the evidence as showing exactly the opposite of what the panel concludes it shows. I read it as evidence that the City knew of dangerous undertows and rip currents next to the beach that had caused drownings all along the Dike, including the manmade beach where the Suarezes drowned. The City nevertheless invited the public to use the reopened beach for recreational purposes, including picnicking and swimming, in exchange for a fee, after building it up and restoring the Dike, with conscious indifference to the effect of its actions and omissions in exposing the public to an extreme risk of drowning, thus breaching its duty of care for the safety of the public.

In my view, the panel opinion in this case takes exactly the position of the line of cases abrogated by the supreme court in *Shumake* by labeling all hidden undertows and rip currents as naturally occurring conditions and labeling all evidence of the enhancement of the danger of the undertow by the City's activity and its indifference to the hazards and failure to warn as evidence of the City's *lack* of knowledge of the hazard, hence as *no* evidence of its gross negligence, and thus as *no* evidence of its waiver of immunity to claims of wrongful death arising from the use of the beach for the purpose for which it was intended, namely as a family-

friendly spot for picnicking, swimming, and enjoying nature. *See Shumake*, 199 S.W.3d at 282 (citing abrogated cases).

On the panel's analysis, all evidence that the City ignored or made worse an already extremely dangerous hidden condition at the manmade beach in the form of virulent hidden undertows and rip currents without taking any steps to ascertain the effect of its activities on the safety of the site or to make the site safe for its intended purpose; that it then invited the public onto the beach precisely for the purpose of picnicking, wading, swimming, and related activities in return for payment of a fee; and that it failed to warn even of known naturally occurring undertows and rip currents that had caused drowning deaths all along the Dike— much less the much more dangerous riptides close to shore created by its own activity in rebuilding the beach—is all irrelevant. Rip currents and undertows, in the view of the panel, are natural occurrences. Thus the panel opinion recreates for this Court, as binding authority, an analysis expressly repudiated by the supreme court in *Shumake*. *See* 199 S.W.3d at 282, 287.

In my view, the panel's holding is directly contrary to the directives of the supreme court in *Shumake*, *Flynn*, and *Kirwan*, and also to the burden of proof required to obtain dismissal of a cause of action on grounds of sovereign immunity in a wrongful death and survivorship case brought subject to the Tort Claims Act and Recreational Use Statute. By discounting *all* of the nonmovant's evidence of

28

jurisdictional facts and relying solely on the conclusory and self-serving testimony of the City's mayor that he did not subjectively know that the City's activities had created an extremely dangerous condition when the beach was used for its intended purpose, the panel reverses the standard of review of a plea to the jurisdiction based on proof of jurisdictional facts. Indeed, its opinion is based on a standard of review that is exactly the opposite of that mandated by the Texas Supreme Court. *See Miranda*, 133 S.W.3d at 226–28.

In my view, there is ample jurisdictional evidence in the record from which the trial court, as fact-finder, could reasonably have concluded that the City's immunity to Suarez's premises liability claim against it was waived by the Tort Claims Act as modified by the Recreational Use Statute. Under *Miranda*, the court reviewing a plea to the jurisdiction is required to look first to the pleadings to determine whether jurisdiction is proper and must construe them liberally in favor of plaintiff, looking to her intent. *See* 133 S.W.3d at 226. If the pleadings do not affirmatively demonstrate or negate the court's jurisdiction, the court must review the evidence, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference and resolving all doubts in favor of the nonmovant. *Id.* at 228. If the evidence raises a fact question on the jurisdictional issue, the fact finder decides that question. *Id.* at 227–28.

Instead of taking Suarez's pleadings as true, however, and construing the evidence liberally in her favor, the panel has done exactly the opposite. The panel has taken the *City's* evidence as true, no matter how conclusory, self-serving, and incapable of objective proof it is; it has discounted and explained away all of Suarez's evidence; and it has, consequently, concluded that, as a matter of law, the City did not waive its immunity to Suarez's suit. *Cf. id.* at 228 (holding that, in considering jurisdictional evidence evidence, reviewing court must "take as true all evidence favorable to the nonmovant" and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor"). On this standard of review, no future similar claim involving wrongful death caused by the failure to warn about hidden natural hazards augmented by human activity on recreational property owned by a state entity can in this Court.

I would hold that Suarez produced sufficient evidence from which the fact-finder as to jurisdictional facts—the trial court—could reasonably have determined that Suarez stated a claim for premise liability arising from the City's gross negligence in failing either to make the beach it opened to the public safe for recreational purposes or to warn of its dangers, knowing of the extreme risk of drowning from hidden rip currents and undertows and of its failure to warn, knowing that it had done no safety studies of the effect of its own actions on these dangerous hidden hazards, and knowing that the hidden rip currents and undertows

30

posed an extreme risk of danger to members of the public using the beach for its intended purpose. Thus, I would hold that Suarez has produced sufficient evidence as to the jurisdictional issue of waiver of immunity for the fact-finder, the trial court, reasonably to have concluded that the City's immunity was waived by the Tort Claims Act as modified by the Recreational Use Statute . *See Miranda*, at 227-28. I would, therefore, hold that the trial court did not err when it denied the City's plea to the jurisdiction, and I would overrule the City's sole issue.

## Conclusion

I believe that the binding precedent created by the panel opinion in this case presents important questions of law regarding the correct construction of a governmental entity's waiver of immunity to liability for a premise defect under the Tort Claims Act as modified by the Recreational Use Statute and the proper standard of review of evidence of jurisdictional facts regarding pleas to the jurisdiction. I also believe that the panel opinion restores an abrogated line of cases binding precedent in this Court and brings this Court's construction of the law in this important area of governmental immunity into conflict with controlling supreme court authority. Thus, I believe this case presents extraordinary circumstances that meet the en banc standard. *See* TEX. R. APP. PROC. 41.2(c).

31

I would grant en banc review, and I would affirm the order of the trial court refusing to dismiss Suarez's claims against the City of Texas City on a plea to the jurisdiction, and I would remand the case for trial on the merits.



Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.

The en banc court Chief Justice Radack and Justices Jennings, Keyes, Higley, Bland, Sharp, Massengale, Brown, and Huddle.

Justice Keyes, dissenting from the denial of en banc review.

32