The CITY OF HOUSTON, Appellant,

v.

Joe CAVAZOS and Viola Cavazos
Individually and as Next Friends
of Thomas Cavazos, Appellee.

No. B14–90–800–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

June 6, 1991.
Rehearing Overruled July 3, 1991.

Joseph A. Callier, Houston, for appellant.

Robert A. Berry, Kevin Dubose, Joel C. Thompson, Houston, for appellee.

Before PRESSLER, JUNELL and ELLIS, JJ.

## OPINION

ELLIS, Justice.

This is an appeal from a judgment entered in a wrongful death suit arising from the drowning death of Edmundo Cavazos on property controlled by the City of Houston. The jury found that the gross negligence of the City of Houston proximately caused the death of Edmundo Cavazos. The jury apportioned negligence at 80% on the City of Houston and at 20% on Ernesto Cavazos, the uncle of Edmundo Cavazos. We affirm.

Appellant assigns four points of error on appeal. In its first point of error, appellant submits the trial court erred in submitting negligence standard of care in the jury charge. In its second point of error, appellant contends the trial court erred in its definition of gross negligence submitted in the jury charge. In its third point of error, appellant maintains that the jury's affirmative response to the gross negligence question was erroneous in that there was insufficient evidence to support the jury's finding. In its fourth point of error, appellant complains that the jury's failure to find either Edmundo Cavazos or Thomas Cavazos negligent was against the great weight of the evidence.

Joe Cavazos and Viola Cavazos, the parents of the deceased child, sued the City of Houston under the Wrongful Death Act for the damages they suffered as a result of losing their son. The Cavazos sued as next friends of their other son, Thomas Cavazos,

for the damages he has suffered as a result of witnessing the death of his brother. The Cavazos also sued under the Survival Statute for the conscious pain and suffering that Edmundo Cavazos suffered prior to his death.

There is an area in Eisenhower Park, behind Lake Houston Dam, where there is a concrete slab upon which people stand to fish. This slab bisects the river and it is possible to cross the river by walking across the slab. When the Cavazos family arrived at this area, they originally stood on the bank and fished from there. Eventually, the Cavazos family decided to cross to the other side of the river by wading along the concrete slab. The slab was covered with water that was between a foot and a foot and a half deep. While the water was shallow, it was also murky; and pedestrians wading across the slab could not see their feet. Although the water at the edge of the slab drops off to a depth of 15 feet, this drop-off was not visible to the people wading on the slab. Before the Cavazos family tried to walk across the slab, they saw numerous people walking across. The oldest Cavazos brother, Eloy, as well as his uncle, Ernesto, both assumed that it was safe to cross the slab. They attempted to cross. Edmundo Cavazos slipped, fell, was carried into the deep water and drowned. Plaintiff's expert witness testified that despite the appearance of safety, the slab was extremely dangerous because of the swift current running across it, the slippery nature of parts of the slab, and the inability to see the dramatic change in depth at the edge of the slab.

■ In its first point of error, the City asserts that the trial court erred in submitting Question 1, which inquires about general negligence, because a finding of gross negligence is required to impose liability on a city under these circumstances.

The submission of general negligence in question 1 was a necessary predicate to submitting comparative causation in question 2. The Cavazos family sued the City of Houston for its role in causing the death of Edmundo Cavazos. The City responded

by accusing five different members of the Cavazos family of responsibility for the incident resulting in Edmundo's death. Because of that tactic by the City, a comparative causation question had to be submitted to assess the degree to which each of the accused parties was responsible. That comparative causation question became question number 2 in the jury charge. However, before the jury could be asked to apportion comparative causation of any party, it first needed to determine whether each of those parties was at least negligent. That task was accomplished in question 1, which inquired whether the negligence of any of the accused parties proximately caused the occurrence in question. Thus, question number 1, was included in the charge as a necessary predicate to question number 2, and question number 2 was made necessary by the City's allegations of comparative causation.

The submission of general negligence in question 1 was harmless because the judgment against the city was based on the gross negligence finding in Question 3. A finding of gross negligence was made by the jury in response to Question 3. It is noted that the submission of Question 1, by itself, would not have been sufficient to satisfy a requirement of a gross negligent finding to impose liability on the City. However, the jury's response to Question 3 supplies the necessary foundation for that judgment. Question 1, at worst, is unnecessary surplusage. We find nothing about the submission of Question 1, in addition to the submission of Question 3, that was "reasonably calculated to cause and probably did cause rendition of an improper judgment in the case ..." Tex.R.App.P. 81(b)(1). Appellant's first point of error is overruled.

■ In its second point of error, appellant contends the trial court erred in its definition of gross negligence submitted in the jury charge. The City presents a twofold complaint concerning the definition of gross negligence: 1) that the definition allowed a finding of conscious indifference *or* malicious intent, rather than exclusively requiring evil intent; and 2) the definition did not require a showing of maliciousness

by a policy making official of the City. The City relies heavily on *City of Gladewater v. Pike*, 727 S.W.2d 514 (Tex.1987). In that case, the Texas Supreme Court acknowledged:

> The *usual* test for gross negligence is the one set out by this court in *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981). To be entitled to exemplary damages a plaintiff must show that entire want of care which would raise the belief that the act or omission complained of was the result of conscious indifference to the right or welfare of the person or persons to be affected by it ... In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care. *Burk Royalty at 920.* (emphasis added.) *City of Gladewater*, 727 S.W.2d at 523.

The definition of gross negligence that was submitted to the jury in this case was:

> 'GROSS NEGLIGENCE' means that entire want of care which would raise the belief that the act or omission complained of was the result of conscious indifference to the rights or welfare of the person or persons to be affected by it, or that shows maliciousness or evil intent by a policy making official of the City of Houston.

The first part of this definition is virtually identical to the definition provided by the Texas Supreme Court in *Burk Royalty*, and later acknowledged by that court as "the usual test for gross negligence" in *City of Gladewater*. The alternative provided in the latter part of the definition is virtually identical to the standard that the City now argues should have been applicable to this case. Thus, the definition used in this case was at least consistent with the usual test for gross negligence, even though it also provided an alternative theory that was more restrictive than the usual test.

An exception to the usual definition of gross negligence has been recognized in two cases involving the gross negligence of a city: *City of Gladewater*, and *Schneider v. City of Cuero*, 749 S.W.2d 614 (Tex.

App.—Corpus Christi 1988, writ den'd). Both of those cases involved an attempt to recover punitive damages against a municipality, and in each opinion the court limited its recognition of a stricter standard to the attempt to recover exemplary damages.

As previously noted, the definition of gross negligence given in this case was consistent with the definition approved by the Texas Supreme Court in *Burk Royalty*. The only cases recognizing an exception to that general rule impose a stricter standard as a prerequisite for obtaining punitive damages against a city. The Cavazos family did not seek punitive damages against the City of Houston. Hence, the punitive damages exception and its attendant standard are not applicable to the case at bar. Accordingly, the normal gross negligence instruction which was submitted to the jury was appropriate. Appellant's second point of error is overruled.

█ In its third point of error, appellant maintains that the jury's affirmative response to the gross negligence question was erroneous in that there was insufficient evidence to support the jury's finding. In support of its position, the City asserts that there is a lack of evidence to show that the City acted with malice and evil intent. Thus, the City's argument is premised upon its erroneous contention, submitted in point of error two above, that this case is governed by the *City of Gladewater* standard rather than the *Burk Royalty* standard. The stricter standard laid out in *City of Gladewater* is only a prerequisite to the recovery of punitive damages. We re-emphasize that punitive damages were not sought in the instant case. Thus, it is the *Burk Royalty* standard that governs this case. The definition of gross negligence provided in *Burk Royalty* does not require maliciousness or evil intent at all, but is limited to conscious indifference. *Burk Royalty*, 616 S.W.2d at 920. The definition fashioned by the trial judge in this case offered the jury a choice of finding conscious indifference *or* maliciousness and evil intent. The City argues that this case is governed by Chapter 75 of the Texas Civil Practice and Remedies Code,

which says that the liability of an owner of property shall not be limited if the owner "has been *grossly negligent or* has acted with *malicious intent* or in bad faith." TEX.CIV.PRAC. & REM.CODE, § 75.002(d) (Vernon Supp.1990).

Further, if this case is wholly outside the Texas Civil Practice and Remedies Code, and the City had the same duty owed by a private landowner to a licensee, the definition is consistent with that standard. The duty that a private person owes a licensee on private property has been defined by the Texas Supreme Court as a duty "not to injure ... [the licensee] ... by *willful, wanton or gross negligence." Lower Neches Valley Authority v. Murphy*, 536 S.W.2d 561, 563 (Tex.1976).

Thus, the chapter of the Civil Practice and Remedies Code relied on by the City allows recovery if there is gross negligence or malicious intent. The common law duty owed to a licensee allows recovery if there is gross negligence or willful and wanton conduct. The trial court's definition of gross negligence, which permitted the jury to consider conscious indifference or evil and malicious intent, was legally correct, and tracked the language of Chapter 75 of the Texas Civil Practice and Remedies Code, upon which the City relies. *See Texas Dept. of Human Serv. v. E.B.*, 33 TEX. SUP.CT.J. 574 (June 23, 1990). Accordingly, evidence of conscious indifference, by itself, is sufficient to sustain the jury verdict. Evidence of malice or evil intent was not required.

█ Evidence that the City was consciously aware of a condition presenting a danger to others, but deliberately ignored the condition and failed to alleviate the possibility of injury, was provided by two law enforcement officers, Park Police Sergeant James Carter, and investigating police officer Mike Martin.

Sergeant Carter was the designated representative of the City in this case. At one time, Carter was the sergeant in charge of Eisenhower Park, the scene of this accident, but he had left Eisenhower Park five years before the accident. Sergeant Carter testified unequivocally that the area behind

the dam was dangerous. Sergeant Carter knew that the slab area behind the dam was used for recreational purposes, and he felt that if people were swimming or wading in that area, the park police should have asked them to leave.

Sergeant Carter felt that the City had a responsibility to warn the public that this was a dangerous area because the dangers were not immediately obvious. Accordingly, at one point Sergeant Carter had installed two signs to prohibit trespassing beyond a certain point. However, those signs were not up on the day that Edmundo Cavazos drowned because they were removed by the City immediately after Sergeant Carter left Eisenhower Park, five years before the drowning. Carter testified that he communicated his feelings about the danger presented by this area to his superior officer. Sergeant Carter further testified that the City was aware of this dangerous condition for many years prior to the drowning of Edmundo Cavazos. If nothing else, the City should have been aware of this considerable danger because between one and three drownings had occurred at this location every year between 1978, when Sergeant Carter left the park, and 1985, the date of his deposition.

Additional testimony was provided by Mike Martin, an officer with the Houston Police Department. Martin was the officer assigned the responsibility of investigating the drowning death of Edmundo Cavazos.

Despite the fact that the City was aware of a dangerous condition on the spillway, Officer Martin testified that there were no signs on the path to the spillway prohibiting fishing or swimming on the spillway. At the end of that path, where the spillway begins, there are no warning signs, and no barriers to keep the public from going onto the spillway. Once on the spillway, where there is a slab, upon which the water is fairly shallow, and then a drop at the edge of the slab to deeper and more treacherous water, there are no signs or markings to indicate where the slab ends and the deep water begins.

Officer Martin testified that the area where Edmundo Cavazos drowned was a very dangerous area. He stated that the area presented a high risk of a drowning occurring in a manner exactly like the drowning of Edmundo Cavazos. Officer Martin testified that he would recommend that the City employ some means of advising the public of the dangers in the area. He did admit that there had been one sign in the area, but it had been knocked down, and a knocked down sign is of no value. He further stated that there should be more than one warning sign in the area and that the area was so dangerous that it probably should be a restricted area. Unfortunately, the area is not restricted, but is heavily used for recreational activities with no warning to the people pursuing those activities.

Officer Martin also testified that another drowning occurred in the same area, under almost identical circumstances, only two months after the death of Edmundo Cavazos. Martin also investigated that accident, and in his investigative report he stated, "This is a very dangerous area and ... there are no visual signs or warnings to indicate this danger. The area has no fence or other security precautions to alert anyone of any possible danger." After these two drownings, Officer Martin advised his supervisors about the drownings, the dangerous condition on these premises, and the need for warning signs and barriers. Despite the fact that this spillway presents a dangerous condition, is widely used for recreational purposes, and has resulted in numerous drowning deaths, as late as the day before trial there were still no warning signs or barriers at this location.

The only aquatic expert who testified at trial, Dr. Frank Bearden of Rice University, stated:

... I was appalled at my visit there at the site, that people would be permitted to be in this area.... I think that there should definitely have been some restricted areas, restricted signs, fencing, obstacles of some kind, that would prevent the average non-knowledgeable aquatic family or person to go into this area.

The essence of gross negligence is the awareness of a substantial risk of harm, and a refusal to take steps to eliminate that risk, in a conscious disregard of the safety and welfare of others. On the spillway at Eisenhower Park there was a substantial risk of harm. That risk had been tragically realized by several drownings a year for a number of years. Despite this risk, the danger was not readily apparent to visitors, and many people continued to come to the spillway area for recreational purposes. Despite the City's awareness of the use of the property, and the danger presented by the property, the City failed to take any steps to warn visitors of the danger, or to prevent them from entering this treacherous area. We find that all of this presents more than sufficient evidence to support the jury finding that the City's failure to act constituted gross negligence. Appellant's point of error three is overruled.

In its fourth point of error, appellant complains that the jury's failure to find either Edmundo Cavazos or Thomas Cavazos negligent was against the great weight of the evidence. In support of its position, the City focuses its argument on the following facts and information: 1) the Cavazos brothers, Thomas and Edmundo, were poor swimmers; 2) the slab was slippery; 3) the Cavazos brothers could not see where the slab ended; and 4) the Cavazos brothers could see that there were boats in the area. In a point of error contending that a jury's failure to find is against the great weight and preponderance of the evidence, this court is compelled to examine all the evidence, and not just that evidence that supports the position of the party attacking the finding. *See Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex. 1986). There is substantial evidence in the record that explains why these four factors fall far short of conclusively establishing negligence on the part of these boys. An examination of the entire record reveals that the great weight and preponderance of the evidence support the jury's failure to find that Thomas Cavazos and Edmundo Cavazos were negligent.

The City first argues that Thomas and Edmundo Cavazos never should have been in this area because they were poor swimmers. However, Eloy Cavazos testified that the family had no intention of going swimming or wading on the day of the incident. They began to walk across the slab because they were fishing, and they saw someone on the other side of the slab catching some fish. They assumed that it was safe to walk across the slab because they saw numerous people walking across the slab without any difficulty. Those other people included small children as young as 2 years old.

The water flowing over the slab was shallow, with estimates ranging from knee level to somewhere between 12 and 18 inches deep. If the boys had planned to go swimming, their inability to swim might be significant. But when they were fishing, and wanted to wade to a better fishing area, across a slab with shallow water, that many people and small children had walked across before them without incident the jury's failure to find negligence is certainly understandable.

The City next points to the fact that the slab was slippery. Ernesto Cavazos, the uncle of Edmundo Cavazos, and the supervising adult on this excursion, testified that he noticed that the slab was slippery only after Edmundo fell and he tried to rescue him, but before that occurred he had never noticed the slab's being slippery. The aquatic expert, Dr. Frank Bearden, testified that even if the slab was slippery, it was still reasonable to conclude that it was safe to walk across because so many other people had done so without difficulty. Under the circumstances, the mere fact that these boys tried to walk across the slab, parts of which turned out to be slippery, does not conclusively establish negligence.

The City next argues that these boys were negligent in walking across the slab because the water was dirty and murky, and it was impossible to see where the slab ended. These facts are true, and support the Cavazos family's position that the boys were not negligent. We now know that even though the water on the slab was

shallow, past the edge of the slab the water was 15 feet deep. However, because the water was murky and dirty, people wading across the slab could not see their feet, nor could they see the drop at the edge of the slab. The inability to see the unmarked drop, and the first-time visitor's ignorance about the existence of that drop, are precisely what make this location so dangerous. Other people testified that the slab area did not appear dangerous, that the dangers were hidden, that the area looked safe, and that the slab area did not look dangerous or menacing. The City asks this court to set aside a jury finding on the basis of these young boys' failure to perceive dangers that their older brother, their uncle, their father, an unbiased eyewitness and an aquatics expert all testified that they did not perceive.

 Finally, the City argues that these boys were negligent because there were boats in the area, which should have indicated to them that there was deep water somewhere. None of the evidence relied upon by the City shows precisely where these boats were. Although these boats certainly should have indicated there was deeper water somewhere out there, that provides no reason to assume that these boys should have known the slab over which they had seen many people walk was in close proximity to that deep water. The aquatic expert, Dr. Bearden, testified that even though the boats showed that there was deep water somewhere, it was still reasonable to conclude that walking on the slab was probably safe. Moreover, as the family was walking across the slab, with the boats and the presumably deeper water to their right, there were fishermen standing in shallow water farther to the right than where Edmundo fell. Thus, even if Thomas and Edmundo had stopped to consider the presence of boats suggesting deeper water, and had made a conscious effort to determine where that deeper water probably started, they had every reason to believe that the deep water started far beyond where they were walking.

A factual question such as negligence falls within the exclusive province of the jury. This court should only set aside the jury finding when that finding is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. The vast majority of the evidence in this case indicates that these two boys had every reason to believe that they were engaged in a safe activity. The four factors relied upon by the City do not in any way compel a conclusion that these boys must have been negligent, or that the jury finding was clearly wrong. Appellant's point of error four is overruled.

Accordingly, the judgment of the trial court is affirmed.