# IN THE SUPREME COURT OF TEXAS

════════════
No. 13-0947
════════════

EDITH SUAREZ, INDIVIDUALLY AND AS SURVIVING PARENT OF A.S. AND S.S.,
DECEASED, AND AS SURVIVING SPOUSE OF HECTOR SUAREZ, DECEASED,
PETITIONER,

v.

THE CITY OF TEXAS CITY, TEXAS, RESPONDENT

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued January 14, 2015**

JUSTICE GUZMAN delivered the opinion of the Court.

This interlocutory appeal involves a municipality's plea to the jurisdiction in a premises-liability case arising from the drowning deaths of three family members at a man-made beach. The surviving spouse and mother of the decedents alleges that the drowning deaths resulted from a peculiar risk of harm created by a confluence of artificial and natural conditions at the beach and that the municipality was grossly negligent in failing to warn or protect the public against those dangers. The trial court denied the jurisdictional plea, but the court of appeals reversed and dismissed the claims for want of jurisdiction. No. 01-12-00848-CV, 2013 WL 867428, at *1 (Tex. App.—Houston [1st Dist.] March 7, 2013). At issue on appeal is whether there is some evidence of the

municipality's liability to invoke the Texas Tort Claims Act's waiver of governmental immunity, as limited by the recreational use statute. *See* TEX. CIV. PRAC. & REM. CODE §§ 75.003(e)-(g), 101.021-.022,.025. The Tort Claims Act generally waives governmental immunity in premises-liability cases when a governmental unit breaches the duty of care that a private party would owe to a licensee. *Id.* §§ 101.021-.022, .025. If premises are open to the public for recreational activities, however, the recreational use statute elevates the burden of proof required to invoke the Tort Claims Act's immunity waiver by classifying recreational users as trespassers and requiring proof of gross negligence, malicious intent, or bad faith. *Id.* § 75.002; *State v. Shumake*, 199 S.W.3d 279, 281 (Tex. 2006). In previous cases applying these statutes, we have held that landowners owe a duty to warn or protect recreational users when artificial conditions create dangerous conditions that are not open and obvious, but have no duty to warn or protect against conditions that are open or inherent, and thus obvious, regardless of whether such conditions are naturally or artificially created. *Compare Shumake*, 199 S.W.3d at 281-82, 88 (man-made culvert created dangerous, hidden undertow), *with City of Waco v. Kirwan*, 298 S.W.3d 618, 626 (Tex. 2009) (edge of cliff is inherently dangerous) *and Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 660 (Tex. 2007) (artificial condition was visible and known to recreational cyclist). The allegation in this case is that artificial conditions interacted with natural conditions to exacerbate and increase inherent risks well beyond what a reasonable recreational user might reasonably anticipate. This case thus involves a convergence of natural and artificial conditions as well as open, inherent, and latent dangers.

Regardless of whether a duty exists, however, when gross negligence is alleged, immunity is waived only if the governmental entity (1) knew about a condition of the property giving rise to

2

an extreme degree of risk and (2) proceeded with conscious indifference to the rights, safety, or welfare of others. *Shumake*, 199 S.W.3d at 287; *see also* TEX. CIV. PRAC. & REM. CODE § 41.001(11). Construing the record in the light most favorable to the petitioner, as we must, there is no evidence that the municipality had knowledge of concealed conditions at the beach creating an extreme risk of harm. We therefore affirm the court of appeals' judgment.

## I. Background

The tragic deaths of a young father and his twin daughters occurred in the waters adjacent to the Texas City Dike, a man-made peninsula jutting 5.4 miles into Galveston Bay off the coast of Texas City, Texas. The Dike was initially created more than 100 years ago to help preserve the Texas City Ship Channel from excessive siltation.

Because of the ship channel's location in Galveston Bay near an inlet to the Gulf of Mexico, currents carry silt into the man-made channel and frequent dredging is required to keep the water navigable. The United States Army Corps of Engineers constructed the Dike to help stop the flow of silt into the channel. Originally completed in 1915, the Dike was extended to its current length in 1934. To maintain the ship channel, the Corps of Engineers regularly dredges the channel and deposits dredged materials consisting of fine-grain sediment at a "spoil area" on the north side of the Dike. Over time, the spoil area has developed into a man-made beach.

In 1931, the State conveyed ownership of the Dike to Texas City and required that the Dike be used only for public purposes. *See* Act "Granting Dike" to City of Texas City, 42nd Leg., R.S., ch. 54, § 1, 1931 Tex. Spec. Laws 134, 134-35. Texas City has owned, maintained, and operated the Dike ever since. In 1963, the Texas Legislature opened the Dike up to recreational activity. Act of

3

May 22, 1963, 58th Leg., R.S., ch. 503, § 2, 1963 Tex. Gen. Laws 1316, 1317. To facilitate access, an asphalt road stretches the length of the five-mile peninsula.

With coastal waters accessible via 10 miles of shoreline, visitors to the Dike engage in recreational activities including boating, fishing, crabbing, and swimming, in addition to non-water-related activities like picnicking, running, and cycling. Amenities at the Dike include boat ramps, piers, parking areas, picnic shelters, portable restrooms, fish-cleaning tables, and street and boat-ramp lights. At some point, signs were erected at several locations along the Dike bearing the following admonitions:

- "Warning! No Swimming [or] Diving. Beware [of] undertow and wake from passing ships."

- "Beware [of] undertow[,] wake, rip current, and sink holes."

- "No lifeguard on duty. Swim in designated area only."

- "No lifeguard on duty. Swim at your own risk. Beware of undertow from passing ships."

Some of the signs' warnings were in English only and others were in both Spanish and English.[1]

On September 13, 2008, Hurricane Ike made landfall near Galveston, Texas. The hurricane caused considerable damage to the Dike—eroding beaches, damaging the roadway, upending and damaging improvements, and destroying or damaging all the warning signs. Due to ongoing repairs, Texas City closed the Dike to the public for nearly two years.

---

[1] There is a suggestion in the record that at least some of these signs were posted at the behest of a former Texas City mayor, Chuck Doyle, in response to his son's diving accident, the circumstances of which are not elucidated. Texas City's current mayor, Matthew T. Doyle, is the former mayor's son and was the victim of the referenced diving accident. He testified that he did not know about a particular impetus for erecting warning signs at the Dike and stated that his accident had nothing to do with swimming skill or ability but resulted from a mistake.

4

While public access was suspended, Texas City repaired or replaced the road, piers, boat ramps, picnic shelters, and lighting structures. But, not all warning signs were replaced. The only warning signs the City replaced were "monument" signs at two boat ramps that were reopened following the hurricane.[2] Those signs, which are large, wooden destination markers, are similar to signs that had been in place at the same locations before the hurricane. The signs include the following warning in English and Spanish: "Warning! No Swimming [or] Diving." The signs also caution in English: "Beware [of] Undertow and Wake from Passing ships." Texas City elected not to replace other warning signs destroyed by the storm. The evidence in the record does not establish the location or number of those signs but it is undisputed that the signs that were not replaced had warned about swimming outside designated areas, cautioned that no lifeguard was on duty, advised recreational users to swim at their own risk, or warned about rip tides and sink holes.

On October 3, 2010, less than a month after the Dike re-opened to the public, Edith and Hector Suarez visited the Dike along with their nine-year-old twin daughters and other family members and friends. They paid the $5 entrance fee charged to nonresidents on the weekends and drove to the beach area that had been formed over time by the deposition of silt dredged from the ship channel. The beach, which was appointed with covered picnic tables, afforded visitors unimpeded access to the water. No area was designated for swimming at the beach, and no signs prohibited swimming or warned of swimming dangers at that location. The tide was high, the wind was strong, and the water was choppy with breaking waves. As soon as the Suarez family had parked their

---

[2] A monument sign without a warning was replaced with another, similar sign at a third boat ramp.

vehicle, the twin girls, still dressed in street clothes, waded into the water up to their knees. Very shortly thereafter, they were seen struggling to stay afloat in deeper water approximately 10 feet from the beach. Hector Suarez and two other men struggled to save the girls, but the rescue attempt failed. Hector and his daughters drowned as they were swept farther from the shore, and the other two rescuers had to help one another back to the beach to escape the strong current.[3]

William Worsham, a coastal engineer retained to ascertain how the incident had occurred, determined that breaking waves and the "noticeably slippery" surface of the submerged beach caused the young victims to lose their footing despite standing in shallow water; the scalloped shape of the beach's surface was characteristic of a beach that can generate rip currents when interacting with waves; and the convergence of these conditions caused the girls to be swept from knee-deep water "to waters deep and rough enough to result in drowning." According to Worsham, on the day of the incident, "[w]ater conditions adjacent to the beach were turbulent and highly variable, consisting of choppy water, breaking waves, oscillating onshore and offshore currents, and longshore currents. It is clear upon inspection that these are difficult swimming conditions." Moreover, "[g]iven the wave and current conditions, upon reaching a water depth of even half a person's height[,] it would be quite difficult . . . to maintain sufficient contact with the bottom to resist being moved in the direction of water motion." In Worsham's opinion, "[e]ven water depths of less than two feet were capable of causing loss of balance," a condition that "was prevalent within 25 feet of the shore in the case of the children involved." Worsham's "[i]nitial analysis showed wind-generated waves interacted with the

---

[3] Because Edith and Hector Suarez share a surname, we refer to Hector by his first name to avoid confusion.

[man-made] beach and caused the upset and loss of footing of the young victims, and that [stronger] tidal currents and local currents resulting from the interaction of waves with the beach surface would transport a person toward deeper water once he/she had lost contact with the bottom . . . ."

Edith Suarez, individually and on behalf of the decedents, sued Texas City, alleging it had actual or constructive knowledge that hidden, dangerous conditions existed in the water where the family drowned and was therefore negligent and grossly negligent in (1) creating a beach, (2) allowing swimming in the area, (3) failing to provide signs warning of perilous conditions that were not obvious to swimmers, and (4) failing to conduct studies to determine the existence of any such perils. Suarez asserted that, in doing so, Texas City failed to use the ordinary care a reasonable and prudent person would have employed to reduce, eliminate, or warn about the risk and, accordingly, breached its duty to warn or make the premises reasonably safe. In the alternative, Suarez claimed Texas City created an attractive nuisance, enticing the public to swim near an area that looked like a beach, knowing there were hidden dangers in the form of deadly undertows, currents, and deep holes in the beach water. In bringing suit against Texas City, Suarez averred that governmental immunity was waived under the Wrongful Death Act and, in the alternative, the Tort Claims Act and the recreational use statute.

Texas City answered with a plea to the jurisdiction, general denial, and several affirmative defenses. The City's plea, as supplemented, asserted that Suarez's pleadings and evidence were insufficient to support jurisdiction. Texas City denied that it owed a duty under the circumstances or that there was any evidence it acted with the culpability required to invoke a statutory waiver of immunity. More specifically, the City asserted it owes recreational users only the degree of care

7

afforded to a trespasser, which does not include warning or protecting against beach conditions and associated risks that are open and obvious, ordinary and natural features of submerged land, and inherent in open-water swimming. The City further alleged that evidence of conscious indifference was lacking and argued that the use of some warning signs affirmatively negated conscious indifference. In addition to other arguments, the City denied the existence of a defect, special or otherwise; asserted that its discretionary decisions regarding placement of warning signs is not actionable under the Tort Claims Act; and argued that the Wrongful Death Act does not waive immunity for municipalities. *See* TEX. CIV. PRAC. & REM. CODE § 101.056.

Texas City also moved for summary judgment on identical grounds and further challenged causation as a matter of law. In support of both the plea and the motion for summary judgment, Texas City offered the affidavit of Tom Kessler, the City's Director of Public Works, and attached photographs showing that warning signs erected by Texas City after Hurricane Ike and installed at two boat ramps were substantively identical to the monument signs damaged in the hurricane. The photos also show that a sign at a third boat ramp bore no warnings either before or after Hurricane Ike.

In response to Texas City's jurisdictional plea and motion for summary judgment, Suarez offered the following evidence: (1) deposition testimony from both the current mayor of Texas City, Matthew T. Doyle, and the Director of Public Works, Tom Kessler; (2) an affidavit from one of the would-be rescuers recounting the events leading up to the drownings; (3) Texas City's responses to Suarez's request for admissions; and (4) an affidavit from Worsham, the coastal engineering expert, in which he "characterize[d] natural and man-made forces that were potentially involved" and

8

"describe[d] in a physical sense how this incident occurred." In his affidavit, Worsham observed that "[t]he directional orientation of [the] recreational beach with respect to wind-generated waves, tidal currents, and ship-generated hydrodynamic effects is unique in the upper Texas coastal region, and does not exist naturally anywhere in Texas" and that, on the day of the incident, "[t]he manmade structure (Texas City Dike) and beach interacted with the [natural] waves and tidal currents to cause energetic breaking waves and stronger currents, each of which was highly variable in strength and direction." He opined that "[t]he water motion in the form of wave action and currents initially caused the loss of footing of these two young victims and resulted in the relatively rapid movement of the young victims from knee deep water into deeper rough water."

After a hearing, the trial court denied Texas City's plea to the jurisdiction and motion for summary judgment. Texas City filed an interlocutory appeal from the denial of its jurisdictional plea. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8). The court of appeals reversed the trial court's order and rendered judgment dismissing Suarez's claims for lack of jurisdiction. In addition to other holdings that are not at issue on appeal, the court of appeals held that the record contained "no evidence [creating] a factual dispute with regard to whether [Texas City] had actual knowledge or awareness of the alleged unique and dangerous property condition existing at the beach at the time of the drowning deaths of Suarez's family." 2013 WL 867428, at *12. Accordingly, the court concluded that Suarez failed to bring a valid gross-negligence claim under the recreational use statute and, as a result, Texas City retained immunity from suit. *Id.*

Suarez moved for panel and en banc reconsideration. Although the court of appeals denied both motions, Justice Keyes, a non-panel member, dissented in an opinion challenging the court's

9

jurisdictional analysis. Justice Keyes stated that the court had improperly relied on precedent pertaining only to natural conditions and incorrectly applied the standard of review by crediting inferences in support of Texas City rather than in favor of Suarez. ___ S.W.3d ____, No. 01-12-00848-CV, 2013 WL 5913185, at *10-13 (Keyes, J., dissenting on reh'g). Because Justice Keyes's dissent addressed the merits of the panel's decision and expressly disagreed with a question of law material to the decision, we have jurisdiction over this interlocutory appeal. *See Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805 (Tex. 2002) (citing TEX. GOV'T CODE § 22.225(b)(4)).

The issues on appeal to this Court are limited to the existence of evidence to support Texas City's liability under the recreational use statute as it pertains to the Texas Tort Claims Act's waiver of immunity. The specific matters presented for our consideration are (1) the existence and parameters of any duty to warn or protect recreational users from the conditions at the man-made beach and (2) whether there is some evidence that Texas City was grossly negligent in discharging any such duty.

## II. Discussion

### A. Governmental Immunity

Absent a valid statutory or constitutional waiver, trial courts lack subject-matter jurisdiction to adjudicate lawsuits against municipalities. *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014); *Tex. Dep't. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). The Texas Tort Claims Act waives immunity from suit but only "to the extent of liability created by [the Act]." *See* TEX. CIV. PRAC. &

10

REM. CODE § 101.025(a). The immunity waiver is therefore intertwined with the merits of a claim under the Act.

Under the Tort Claims Act, a governmental unit is liable for "personal injury and death so caused by a condition or use of . . . real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *Id.* § 101.021; *see State v. Shumake*, 199 S.W.3d 279, 283 (Tex. 2006). In premises-defect cases, the governmental unit owes "only the duty [of care] that a private person owes to a licensee on private property."[4] *Id.* § 101.022(a). When property is open to the public for "recreation," however, the recreational use statute further limits the governmental unit's duty by classifying recreational users as trespassers and limiting liability for premises defects to claims involving gross negligence, malicious intent, or bad faith. *Id.* at § 75.002. In doing so, the statute elevates the burden of proof necessary to invoke the Tort Claims Act's statutory waiver. *Id.* §§ 75.003(d)-(g) (the recreational use statute neither creates liability nor waives sovereign immunity, but "limits the liability of a governmental unit under circumstances in which the governmental unit would be liable under [the Tort Claims Act]"); 101.058 (the recreational use statute controls to the extent it limits a governmental unit's liability under the Tort Claims Act). As used in the recreational use statute, the term "recreation" includes a non-exclusive list of activities, including "swimming" and "picnicking." *Id.* § 75.001(3). Suarez does not dispute that her family was engaged in these activities and that the recreational use statute therefore applies. *See City of Bellmead v. Torres*, 89 S.W.3d 611, 614 (Tex. 2002).

---

[4] Exceptions amplifying the government's duty exist and were alleged to apply in this case. *See* TEX. CIV. PRAC. & REM. CODE § 101.022(a), (b). However, the court of appeals determined those matters adversely to Suarez, and they are not at issue on appeal to this Court.

Furthermore, Suarez does not allege that Texas City acted with malicious intent or in bad faith; accordingly, Texas City "may be liable for gross negligence only to the extent that it owed . . . a legal duty." *See Kirwan*, 298 S.W.3d at 623. Considering the interplay between the Texas Tort Claims Act and the recreational use statute, Texas City retains immunity from suit absent evidence of circumstances giving rise to a duty to warn or protect coupled with the requisite mental state. Suarez contends that immunity is waived because (1) Texas City had a duty to warn about or protect against the extreme and unusual dangers created by the interaction of natural forces with the man-made dike and (2) there is some evidence Texas City acted with gross negligence by failing to warn or protect the decedents from those conditions. *See Shumake*, 199 S.W.3d at 287-88.

### B. Standard of Review

Whether subject-matter jurisdiction exists is a question of law that can be challenged, as it was here, by a plea to the jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). We review de novo the disposition of Texas City's jurisdictional plea. *Miranda*, 133 S.W.3d at 226. Because we address a plea to the jurisdiction in which disputed evidence implicates both the court's subject-matter jurisdiction and the merits of the case, we consider relevant evidence submitted by the parties to determine if a fact issue exists. *Id.* at 227. We take as true all evidence favorable to the nonmovant, indulge every reasonable inference, and resolve any doubts in the nonmovant's favor. *Id.* at 228. If the evidence creates a fact question regarding jurisdiction, the plea must be denied pending resolution of the fact issue by the fact finder. *Id.* at 227–28. If the evidence fails to raise a question of fact, however, the plea to the jurisdiction must be granted as a matter of law. *Id.* at 228.

12

## C. Analysis

We have been called upon on several occasions to examine when circumstances existing in a recreational setting give rise to a duty to warn or protect. We have found such a duty when an artificial condition created a risk of harm that was latent and not so inherent in the recreational use that it could reasonably be anticipated. *See Shumake*, 199 S.W.3d at 281–82, 288 (recognizing a duty to warn or protect when a man-made structure—an underground culvert—interacted with the natural perils associated with river tubing to create a powerful undertow that sucked a nine-year-old girl under water and trapped her in the culvert). On the other hand, we have declined to impose a duty for premises conditions that are open and obvious, regardless of whether such conditions are artificial or naturally occurring. *See Kirwan*, 298 S.W.3d at 623, 626 (concluding that landowner had no duty to warn about risk of falling associated with sitting on cliff's edge even though the particular risk—the collapse of the cliff—was unexpected); *Flynn*, 228 S.W.3d at 655, 659–60 (finding no duty to warn or protect cyclist from visible oscillating sprinkler that knocked the plaintiff off her bike as she rode along a public trail). For naturally occurring conditions, our jurisprudence suggests that obvious conditions include dangers that are not necessarily visible but are inherent in the recreational use. *Kirwan*, 298 S.W.3d at 626. Although we have not directly addressed whether a duty arises with respect to conditions that are naturally occurring but concealed and unexpected, we have said we could "envision" such a duty

> where a landowner knows of a hidden and dangerous natural condition that is located in an area frequented by recreational users, where the landowner is aware of deaths or injuries related to that particular condition, and where the danger is such that a reasonable recreational user would not expect to encounter it on the property.

13

*Id.* at 626.

Here, we need not consider whether Texas City had a duty to warn or protect under the circumstances alleged to exist at the Dike because, even assuming the existence of such a duty, there is no evidence that Texas City was grossly negligent.

As used in the recreational use statute, gross negligence has both objective and subjective components:

> (1) viewed objectively from the standpoint of the actor at the time of its occurrence, the act or omission involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

> (2) the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Flynn*, 228 S.W.3d at 660 (citing TEX. CIV. PRAC. & REM. CODE § 41.001(11)); *Louisiana-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 246 (Tex. 1999). To raise a fact issue regarding gross negligence, there must be legally sufficient evidence that Texas City had actual, subjective awareness that conditions at the beach involved an extreme degree of harm but nevertheless was consciously indifferent to the rights, safety, or welfare of others. *Flynn*, 228 S.W.3d at 660. "[I]n other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care." *Louisiana-Pac. Corp.*, 19 S.W.3d at 246–47. We assume for purposes of our analysis that there is some evidence of an extreme risk considering both the probability and magnitude of the harm. But Suarez's claim fails nonetheless because there is no evidence that Texas City was subjectively aware of perils at the beach that were beyond the ken of a reasonable recreational user. *See Bellmead*,

14

89 S.W.3d at 614 (in premises-defect cases, the risk or condition alleged must be the cause of the resulting injury).

To satisfy the subjective-knowledge component of the gross negligence standard, the governmental entity must have "knowledge that the dangerous condition existed at the time of the accident." *City of Corsicana v. Stewart*, 249 S.W.3d 412, 414–15 (Tex. 2008). Suarez's allegation that Texas City had knowledge of latent perils at the man-made Dike rests on circumstantial evidence and inferences alleged to arise from evidence that, prior to Hurricane Ike, Texas City (1) had posted warning signs—including signs that said: "Beware. Undertow and wake, rip currents, and sink holes," "No lifeguard on duty. Swim at your own risk," and "Swim in designated area only"—but failed to replace the signs after the hurricane; (2) had previously provided a "designated swimming area" somewhere at the beach but had not established such an area after Hurricane Ike; and (3) knew an unspecified number of drowning deaths had previously occurred at unknown locations along the Dike over the course of an unspecified time period. To the extent this evidence raises any inference that the City knew uniquely perilous conditions existed at the beach (or the Dike generally), the evidence is equally consistent with mere knowledge of risks inherently associated with open-water swimming. As such, it is no evidence of subjective awareness of and conscious indifference to the enhanced marine hazards alleged to have caused or contributed to the drowning deaths of Hector Suarez and his daughters. *See City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex. 2005) ("When the circumstances are equally consistent with either of two facts, neither fact may be inferred." (quoting *Lozano v. Lozano*, 52 S.W.3d 141, 167 (Tex. 2001))).

15

Circumstantial evidence can establish actual knowledge but such evidence must "either directly or by reasonable inference" support that conclusion. *Stewart*, 249 S.W.3d at 415 (quoting *State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002)). An inference is not reasonable, however, if it is premised on mere suspicion—"some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727–28 (Tex. 2003) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 210 (Tex. 2002)). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 & n.3 (Tex. 1993) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983)). An inference is not reasonable if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001)); *see also City of Keller*, 168 S.W.3d at 814. Reviewing the record in the light most favorable to Suarez, we conclude there is no evidence Texas City knew perilous conditions existed along the Dike that exceeded those inherently associated with aquatic activities in open water or beyond what would reasonably be expected to exist.

Suarez first relies on undisputed evidence that before Hurricane Ike, Texas City had erected signs on the Dike warning visitors about undertows, wakes, rip currents, and sink holes and cautioning them not to swim or to swim at their own risk. Although the admonitions on those signs certainly imply an understanding of the perils associated with entering the waters surrounding the Dike, they refer to common marine hazards that a reasonable recreational user would know or expect

16

to exist, especially in areas where boaters and swimmers regularly interact. They do not, perforce, give rise to an inference that Texas City had actual knowledge of any conditions or risks beyond those open and inherent in open-water recreational use. Indeed, the signs do not even hint that conditions at the beach were of such magnitude as to sweep away even non-swimmers wading in shallow water. As we acknowledged in *Kirwan*, landowners may err on the side of safety by warning visitors of dangerous natural conditions whether or not the landowner has any duty to provide such warnings. 298 S.W.3d at 625–26. Other than guesswork and conjecture, the language used on the pre-Hurricane Ike warning signs gives no purchase to Suarez's allegation that Texas City was aware of an unusual, extreme, and concealed risk of harm at the Dike.

Suarez next points to the establishment and subsequent elimination of a "designated swimming area" as evidence that Texas City had knowledge of dangerous conditions in the water. In her brief, Suarez contends that (1) Texas City specifically designated "safe areas for swimming" before Hurricane Ike, (2) no designated swimming area was reestablished after the hurricane, and (3) her husband and daughters drowned in an area previously designated for swimming. The inference Suarez suggests is not clear. She implies both that designating a swimming area at the beach supports an inference that swimming was recommended as being safe there and that the designated swimming area was discontinued because it was not safe to swim at that location.

For some period of time, Texas City had erected a warning sign on the Dike that read "No lifeguard on duty. Swim in designated area only." The sign may have been placed at the beach, but the record is unclear on that point. The location of the designated swimming area is also speculative, but may have been at the beach and possibly in the area where the drownings occurred. But even

17

assuming the facts are as Suarez alleges, what inference do these facts generate? One could equally infer any of the following: (1) Texas City's knowledge that swimming at any location at the Dike was abnormally dangerous; (2) Texas City knew that, whatever conditions existed at the Dike, they were no different in the designated location; or (3) establishing a segregated swimming area was futile when people can and do enter the water all along the 10-mile shoreline.

Tom Kessler, Director of Public Works, testified that the swim area "wasn't there very long"; "you're swimming at your own risk in that area, too"; "[t]here was nothing special about it. It was just set aside"; "[t]he hazards were essentially the same [because] [i]t's the same bottom, the same currents, same everything, other than it had some [pylons] around it"; and swimming occurred outside as well as inside the designated swimming area when it existed. The only evidence in the record regarding the purpose of the designated swimming area is that it had been intended to reduce the interaction between recreational boaters and swimmers. Mayor Doyle testified that "[t]he pylon area was there to separate the boats, the catamarans . . . from the swimmers. . . . It may have been a designated swimming [area] but it certainly wasn't the only swimming area" because people "swim all over the dike." Nothing more insidious could reasonably be inferred from the absence of a specially designated swimming area after Hurricane Ike.

Suarez next contends that Texas City knew dangerous conditions existed because people had previously drowned at the beach. Although Kessler affirmed that "other drowning deaths on the dike [occurred] before October 3, 2010," the record in this case is not comparable to other cases in which courts have found sufficient evidence of knowledge based on evidence of prior incidents.

18

In *Shumake*, the city knew about the dangers associated with a man-made culvert because only days before the incident, both a Parks Department employee and the Austin Parks Department were informed that three park patrons nearly drowned in the same area from the same undertow that killed the Shumakes' daughter. 199 S.W.3d at 281, 288. Similarly, in *City of Houston v. Cavazos*, a child drowned while attempting to cross a river over a concrete slab partially covered in water. 811 S.W.2d 231, 231 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd). The slab appeared to be covered with about a foot of murky water but the water concealed a fifteen-foot drop-off at the concrete slab's edge. *Id.* The child slipped, fell, and was carried into deeper water where he drowned. *Id.* In *Cavazos*, the court found evidence of knowledge based in part on testimony from two law-enforcement officers that the dangers at the location were well known to the city. *Id.* at 234-35. Both officers stated unequivocally that the area was dangerous and that warnings were imperative. *Id.* One of the officers testified that he had personally posted warning signs five years before the child died, the signs were not up at the time of the incident because the city had removed them, and the city must have known about the dangers because as many as three drownings had occurred every year at the same location over a seven-year period. *Id.* at 235; *see also City of El Paso v. Zarate*, 917 S.W.2d 326, 332–33 (Tex. App.—El Paso 1996, no writ) (finding evidence of knowledge where a child nearly drowned in the same location four years earlier).

Here, the record is devoid of similar evidence. Suarez presented no evidence describing the number, nature, location, frequency, or circumstances of any previous drownings over the fifty-year period the Dike has been open to the public for recreational purposes. No evidence exists that any previous drownings occurred under conditions similar, in any respect, to those conditions Suarez's

19

expert attributed to the deaths of Hector Suarez and his daughters. In fact, nothing in the record suggests that any drownings or near drownings occurred with such frequency or under such conditions that it would be reasonable to infer actual knowledge of risks in excess of those normally associated with coastal-water recreation. Considering the Dike's size, the plethora of hazards inherently present there, and the length of time it has been open to the public, the bare fact that other drownings have occurred does not create a reasonable inference that Texas City had subjective knowledge of an extreme risk of harm.

Finally, Suarez cites deposition testimony from the current mayor, Matthew Doyle, who was responsible for determining whether and to what extent to replace warning signs at the Dike that were damaged or destroyed by Hurricane Ike. Doyle admitted that he knew that wakes from passing ships could affect wave action along the Dike and that choppy water from wind, undertows, and rip tides increases the risk of drowning. Again, these are risks and conditions that would ordinarily be anticipated by reasonable recreational users interacting with coastal waters along a peninsula stretching five miles into Galveston Bay. The mayor consistently asserted that undertows "occur[] out in the water, period" and "[a]ny time you enter the water, you're taking on some kind of risk." Moreover, while the mayor acknowledged that the Dike affects the natural conditions in the water, he also asserted the effects were no different from those other land masses would cause and, even without the Dike, dangers would still exist because "[w]e're on the Gulf Coast." No knowledge of the particular risk alleged can be inferred from mere knowledge that marine activities are inherently dangerous and can be affected by variable conditions.

20

Construing the evidence and every reasonable inference in Suarez's favor, we conclude there is no evidence from which a reasonable factfinder could conclude that Texas City possessed actual, subjective awareness that the combined effect of the Dike's size and location, along with the deposition of fine-grained sediment, altered the natural conditions in the water at the beach. There is likewise no evidence that Texas City knew about or appreciated the gravity of any danger created by the combined effect of man-made and natural conditions in the water at the beach. Because the evidence fails to raise a genuine and material fact issue concerning gross negligence, Texas City retains immunity from suit and the trial court lacks jurisdiction over Suarez's claims.

## III. Conclusion

We hold Suarez failed to produce evidence sufficient to invoke the Texas Tort Claims Act's waiver of immunity from suit. We therefore affirm the court of appeals' judgment dismissing the petitioner's claims for want of jurisdiction.

_____
Eva M. Guzman
Justice

**Opinion delivered:** June 19, 2015

21