Opinion issued August 3, 2023



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00924-CV

———————————

## CITY OF BAYTOWN, Appellant

## V.

## FABIO FERNANDES, Appellee

On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Case No. 2021-43658

## O P I N I O N

In this accelerated interlocutory appeal, the City of Baytown appeals from the

trial court's denial of its plea to the jurisdiction asserting governmental immunity.

We reverse and dismiss this lawsuit for lack of subject-matter jurisdiction.

## BACKGROUND

### Plaintiff's Lawsuit

Fabio Fernandes sued the City of Baytown for negligence. In his live pleading, he alleges that he sustained injuries due to the negligent operation of a waterslide at Pirates Bay Waterpark, which is owned by the City. According to Fernandes, he went down the waterslide after receiving approval from the lifeguard on duty. But the catch basin at the end of the waterslide had insufficient water to slow him down, and as a result he suffered severe injuries at the bottom.

Fernandes alleges the City knew or should have known of the unreasonably dangerous condition on the slide but did not correct it or warn him. He further alleges he could not have reasonably discovered the danger himself.

Fernandes concedes the City is a governmental unit. But he contends the Texas Tort Claims Act and Recreational Use Statute waive its governmental immunity for personal-injury claims "arising out of premises liability through gross negligence" and that the City was grossly negligent in this case.

### City's Jurisdictional Plea

The City filed a plea to the jurisdiction contending Fernandes must plead and prove gross negligence to establish a waiver of its governmental immunity, and alleging the evidence refutes gross negligence. For the proposition that gross negligence is required, the City relies on the Recreational Use Statute.

In support of its plea, the City attached the declaration of Jenna Stevenson, the Aquatics Superintendent for the City's Parks and Recreation Department. In her declaration, Stevenson stated that Pirates Bay is owned by the City and part of her duties as superintendent includes management of the waterpark.

Stevenson declared she is familiar with the incident involving Fernandes. It occurred at the catch basin, also called the catch pool or shutdown lane, on a waterslide known as the Mat Racer. She stated she was not aware of any accidents before his in the Mat Racer's catch basin resulting from insufficient water.

Stevenson further declared that all of the City's lifeguards are trained before they begin working. This training includes ensuring that the water level is at the fill line at the bottom of the Mat Racer waterslide before sending patrons down the slide. The training also instructs lifeguards working the Mat Racer catch basin to position themselves so that they are facing a sign that reminds them how high the water level should be in the catch basin before riders are sent down the waterslide. Certain lifeguard training materials were affixed to her declaration.

According to Stevenson, the aforementioned training was in place before the incident involving Fernandes. Stevenson likewise stated that the fill line reminder sign was present at the location of the incident on the day it happened.

In addition, the City attached the transcript of Stevenson's deposition in support of its jurisdictional plea. Stevenson testified that she was at Pirates Bay on

the day of the accident. The park's lightning detector went off that day, so the lifeguards cleared the patrons from the water and turned off power to the slides. When this is done, the water on the waterslides is depleted. Once the park's lightning detectors no longer indicated lightning and she received notification from management that it was safe to return to the water, Stevenson notified patrons via loudspeaker that it was safe to do so.

The Mat Racer has existed since the waterpark's opening day in 2010. Stevenson did not know of any prior or subsequent incidents involving the Mat Racer, including incidents relating to insufficiency of the water in the catch basin.

Stevenson spoke with the lifeguard on duty at the Mat Racer after the incident involving Fernandes. The lifeguard said that when the water came back on after the lightning alert, he thought it was okay to send people down, so he gave the thumbs-up for patrons to go down the slide. But he noticed they were coming down the slide faster than usual and having impacts at the bottom. So he blew his whistle for help.

Stevenson testified that the catch basin is designed to slow riders at the bottom of the waterslide. There is a sticker on the side of the slide that shows how high the water level needs to be to safely serve its intended purpose. The lifeguard on duty was trained to make sure the water level was at this fill line, but he made a mistake by failing to do so before the accident in question. Stevenson believed that the lifeguard's mistake caused the accident.

4

Regarding the training lifeguards receive about the Mat Racer, Stevenson testified that they are told where and how to stand in the catch basin. Further, they are shown the sticker concerning the water fill line, and they are told that the water must be up to that line before patrons are sent down the slide. The sticker reinforces the lifeguard training, stating: "Do not dispatch riders until shutdown lane is full to level markings."

The City also attached a transcript of the deposition of Fernandes to its jurisdictional plea. He testified that when he reached the end of the waterslide, he went over the wall at the far end of the catch basin. He stated that his hand was injured and that one of his lower hips began to bruise. Fernandes testified that the slide's water was turned on but that the water was below the fill line in the catch basin. After the accident, he was eventually taken to the emergency room of a local hospital. At the time of his deposition, he was still being treated for pain in his hand and back.

**Plaintiff's Response**

In response to the City's jurisdictional plea, Fernandes argued that the Recreational Use Statute does not apply and that he is therefore not required to show gross negligence to establish that the legislature waived the City's immunity. He further argued that the evidence raises a genuine issue of material fact as to the jurisdictional issue of gross negligence even if the statute applies.

5

In addition to the deposition transcripts of Stevenson and himself, Fernandes also relied on the Pirates Bay incident report and multiple Pirates Bay employee witness statements about the incident.

The Pirates Bay incident report, which was made by Stevenson in her capacity as supervisor, states that the lifeguard on duty at the Mat Racer waterslide "dispatched riders before the catch pool was full of water." This caused several riders to gain too much speed and "hit the end of the slide."

The lifeguard made one of the employee witness statements. He said that when "the water came back on," he "thought that meant it was okay to send people down." So, he gave "the thumbs up" for riders to begin using the waterslide. "They went down the slide fine but there wasn't enough water in the bottom to stop them." The lifeguard concluded: "It was my fault. If I wouldn't have given the thumbs up this wouldn't have happened."

## Trial Court's Ruling and Appeal

The trial court denied the City's jurisdictional plea. The City appeals.

## DISCUSSION

The City contends the trial court erred in denying its jurisdictional plea. Citing the Recreational Use Statute and Texas Tort Claims Act, the City maintains that under the circumstances of this case, which involve personal injuries sustained at a government-operated waterpark, the legislature has waived governmental immunity

solely in instances involving gross negligence and that the jurisdictional proof presented to the trial court refutes any claim of gross negligence.

## Standard of Review

A party may challenge the existence of subject-matter jurisdiction by a plea to the jurisdiction. *Suarez v. City of Tex. City*, 465 S.W.3d 623, 632 (Tex. 2015). Because the existence of subject-matter jurisdiction is a question of law, we review a trial court's ruling on a plea to the jurisdiction de novo. *Id.* When, as here, the party challenging subject-matter jurisdiction submits evidence challenging the existence of jurisdictional facts, we evaluate the evidence to ascertain whether a genuine issue of material facts exists on the jurisdictional issue. *Id.* at 632–33. We take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Id.* at 633. If the evidence creates a fact issue as to jurisdiction, the plea must be denied pending resolution of the fact issue by the factfinder. *Id.* If the evidence fails to raise a genuine issue of material fact on jurisdiction, the jurisdictional plea must be granted as a matter of law. *Id.*

## Applicable Law

Cities like Baytown have governmental immunity from suit and liability. *Id.* at 631–32; *City of Houston v. Nicolai*, 539 S.W.3d 378, 386 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Absent a waiver of immunity, trial courts lack subject-

matter jurisdiction to hear lawsuits against cities. *Suarez*, 435 S.W.3d at 631; *Nicolai*, 539 S.W.3d at 386.

Though the Texas Tort Claims Act waives governmental immunity for certain kinds of claims, the Recreational Use Statute, which applies to governmental units, effectively limits the scope of the former's waiver of immunity for an "owner, lessee, or occupant of real property" who gives permission to others "to enter the premises for recreation." TEX. CIV. PRAC. & REM. CODE § 75.002(c), (f). When "a person enters premises owned, operated, or maintained by a governmental unit and engages in recreation on those premises, the governmental unit does not owe to the person a greater degree of care than is owed to a trespasser on the premises." *Id.* § 75.002(f). To establish a waiver of immunity under the Recreational Use Statute, ordinary negligence is insufficient; instead, a plaintiff must establish the governmental unit "has been grossly negligent or has acted with malicious intent or in bad faith." *Id.* § 75.002(d); *Univ. of Tex. v. Garner*, 595 S.W.3d 645, 648 (Tex. 2019) (per curiam) (statute effectively immunizes landowner from ordinary negligence claims when landowner allows others to use its land for certain types of recreational activities by requiring claimants to prove gross negligence, malicious intent, or bad faith as prerequisite for recovery).

The Recreational Use Statute applies only to certain activities defined as "recreation." TEX. CIV. PRAC. & REM. CODE § 75.001(3). The statute defines

8

"recreation" by means of a nonexclusive laundry list, including activities like "swimming" and "water sports." *Id.* § 75.001(3)(C), (K); *see Suarez*, 465 S.W.3d at 632 (statute's list of recreational activities is nonexclusive). Apart from the listed recreational activities, the statute includes a catch-all provision extending its scope to "any other activity associated with enjoying nature or the outdoors." TEX. CIV. PRAC. & REM. CODE § 75.001(3)(L). So, for example, our Supreme Court has held that sitting on a swing constitutes recreation under the Recreational Use Statute, even though the statute does not list this activity or anything quite like it, due to the statute's general inclusion of activities associated with enjoying the outdoors and the statute's recognition that recreation includes activities involving structures on the premises. *City of Bellmead v. Torres*, 89 S.W.3d 611, 614–15 (Tex. 2002); *see also* TEX. CIV. PRAC. & REM. CODE § 75.001(2) (premises defined to include "land, roads, water, watercourse, private ways, and buildings, structures, machinery, and equipment attached to or located on the land, road, water, watercourse, or private way").

Assuming a recreational activity falls within the scope of the Recreational Use Statute, immunity is waived only if the governmental unit was grossly negligent or worse. *See* TEX. CIV. PRAC. & REM. CODE § 75.002(c), (f); *Suarez*, 465 S.W.3d at 627 (statute classifies recreational users as trespassers and requires proof of gross negligence, malicious intent, or bad faith). To prove gross negligence, a plaintiff

9

must show the governmental unit (1) knew about a condition of the property giving rise to an extreme degree of risk and (2) proceeded with conscious indifference to the rights, safety, or welfare of others. *Suarez*, 465 S.W.3d at 627. Gross negligence has both objective and subjective components. *Id.* at 633. Viewed objectively from the point of view of the actor at the time of the occurrence, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others. *Id.* In addition, the actor must have had actual, subjective awareness of the risk involved, but nevertheless have proceeded with conscious indifference to the rights and safety of others. *Id.* In other words, an actor is grossly negligent when the evidence shows it knew of the danger, but its acts or omissions demonstrate that it did not care. *Id.* at 634.

**Analysis**

*Applicability of the Recreational Use Statute*

The parties disagree as to whether riding a waterslide at an outdoor waterpark constitutes recreation for purposes of the Recreational Use Statute. We hold it does.

At the outset, we acknowledge that there is no precedent on all fours with the present appeal. The lone Texas appellate decision addressing a waterslide in the context of the Recreational Use Statute applied the statute to the plaintiff's claims, but the plaintiff does not appear to have challenged the statute's applicability in that case. *Bernhard v. City of Aransas Pass*, No. 13-13-00354-CV, 2014 WL 3541677,

10

at *1, *4 (Tex. App.—Corpus Christi July 14, 2014, no pet.) (mem. op.). Similarly, our court applied the statute to an indoor and outdoor pool that included slides and a lazy river, but there the plaintiff did not dispute that the injured party had been swimming, which is expressly listed by the statute as being among the activities constituting recreation. *Henry v. City of Angleton*, No. 01-13-00976-CV, 2014 WL 5465704, at *1, *6 (Tex. App.—Houston [1st Dist.] Oct. 28, 2014, no pet.) (mem. op.). Nonetheless, the statute and our Supreme Court's interpretation of it convince us that riding a waterslide falls within the scope of the Recreational Use Statute.

In *Torres*, the Supreme Court held that sitting on a swing constitutes recreation under the Recreational Use Statute. 89 S.W.3d at 614–15. The Court did so even though the statute does not include swinging on a swing set, sitting on a swing, or any similar activity in its definition of recreation. *Id.* The Court reasoned that swinging is recreational because it is within the type of activity associated with enjoying the outdoors, which generally is within the statute's scope. *Id.* at 615. In addition, the Court reasoned that the statute contemplates recreation related to structures on the premises, like swing sets or other playground equipment. *Id.*; *see also Kopplin v. City of Garland*, 869 S.W.2d 433, 441 (Tex. App.—Dallas 1993, writ denied) (playing on playground equipment is recreation under statute).

If sitting on a swing at a playground is recreation, then so is riding a waterslide at a waterpark, which is the aquatic equivalent of playground equipment. If anything,

11

the applicability of the Recreational Use Statute is clearer with respect to waterslides than swings. The statute expressly lists "swimming" and "water sports" as activities within its ambit. TEX. CIV. PRAC. & REM. CODE § 75.001(3)(C), (K). Riding down a waterslide into a pool of water, resembles these two expressly listed activities. When, as here, a term is defined by a nonexclusive laundry list of activities that includes a catch-all provision, like the one here concerning other activities associated with enjoying the outdoors, the definition generally embraces activities like the ones expressly listed. *See Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 504 (Tex. 2015) (noting that when specific items in statutory definition are followed by catch-all provision, catch-all provision is limited to items like the ones specified).

In so holding, we note that in cases involving pools, Texas appellate courts have not limited the Recreational Use Statute's application to instances in which the injured party was in the water when injured. *See, e.g.*, *City of Dalhart*, 476 S.W.3d 103, 107–08 (Tex. App.—Amarillo 2015, pet. denied) (applying statute to claims involving child injured while seated at picnic table inside pool facility during mandatory break in which lifeguards made swimmers get out of pool); *Howard v. E. Tex. Baptist Univ.*, 122 S.W.3d 407, 408, 414 (Tex. App.—Texarkana 2003, no pet.) (applying statute to claims involving person injured in midair while diving from outdoor pool's board, albeit in case in which recreational status was unchallenged); *see also Karl v. Brazos River Auth.*, 494 S.W.3d 168, 172–74 (Tex. App.—Eastland

2015, pet. denied) (applying statute to claims of person injured while walking on authority's premises en route to Possum Kingdom Lake to go swimming). Here, however, it is undisputed that Fernandes was participating in an aquatic activity as he traveled down the waterslide into the catch basin, which he alleges was insufficiently full and thus failed to stop him, resulting in his injuries. So, Fernandes's activity of sliding down a waterslide at the time of his injury bears far more resemblance to "swimming" or "water sports" than some other instances in which the Recreational Use Statute has been applied by Texas courts in cases involving pools. It therefore would be incongruous with established precedent to hold the statute is not applicable here, particularly given our Supreme Court's instruction that the nature of the activity at the time of the injury is dispositive with respect to whether the activity is recreational and thus lies within the statute's scope. *See Torres*, 89 S.W.3d at 614 (stating that what injured party was doing when injured controls this issue); *see also Garner*, 595 S.W.3d at 650 n.4 (holding bicycling— which is activity expressly listed as recreational in statute—fell within statute's scope even if plaintiff claimed she was bicycling for transportation when injured, rather than for recreation or enjoyment of outdoors, as nature of activity, rather than subjective intent, controls); *City of San Antonio v. Peralta*, 476 S.W.3d 653, 658 (Tex. App.—San Antonio 2015, no pet.) (holding same as to bicyclist who claimed he was commuting by bike).

Citing *University of Texas at Arlington v. Williams*, Fernandes argues that the Recreational Use Statute does not apply because it solely applies to activities associated with nature or the outdoors in the sense of the part of the world that is separate from areas of human habitation. 459 S.W.3d 48 (Tex. 2015). Thus, he reasons, the statute does not encompass all outdoor activities. In particular, Fernandes urges the statute does not apply to outdoor waterparks, which he equates with Maverick Stadium at the University of Texas at Arlington campus, the venue at issue in *Williams*. *Id.* at 49. There, the Court held that the plaintiff, who fell and was injured while at the stadium as a spectator at a high school soccer match, was not engaged in recreation because the statute does not include "a spectator at a competitive-sports event." *Id.*

We agree with Fernandes that the Recreational Use Statute does not apply to all outdoor activities simply because they take place out of doors. But we disagree with his argument, predicated on *Williams*, that the statute applies only to activities that occur in natural settings or in outdoor areas beyond those that are generally inhabited by humans—"the vast natural world of Texas" or "the plains and prairies, lakes and rivers, hills and mountains," as Fernandes puts it—for several reasons.

As an initial matter, though Fernandes does not acknowledge it, the *Williams* opinion on which he relies is a plurality opinion. 459 S.W.3d at 49–57 (plurality op.). In *Williams*, the Court was fractured. Four justices joined the plurality opinion.

14

*Id.* There were two separate concurring opinions, one joined by two justices, and another joined solely by its author. *Id.* at 57–63 (concurring ops.). The remaining two justices concurred in part and dissented in part. *Id.* at 63–67 (concurring and dissenting op.). While a majority agreed on the result, which was that the Recreational Use Statute did not apply to the spectator's claims because she was not engaged in a recreational activity under the statute, a majority did not agree as to the rationale. In short, though the plurality in *Williams* advocated a position not unlike the one Fernandes advances, a majority of the Court did not embrace the plurality's reasoning. *See id.* at 54–55 (Devine, J., plurality op.) (reasoning that spectating, which is not expressly listed as a recreational activity, does not qualify as recreation under statute's catch-all provision because spectating is not activity associated with enjoying nature or outdoors, terms that refer to portion of physical world removed from human habitation, because nature and outdoors are not integral to enjoyment of competitive sports, the focus of which is competition itself rather than where competition takes place); *id.* at 57–59 (Guzman, J., concurring) (reasoning that plaintiff was not even spectating when injured but was instead trying to acquire and sign form releasing child from school after soccer match and thus was not recreating because activity at time of injury controls and statute neither defines acquisition or signing of release as recreation nor denominates any similar activity as recreation); *id.* at 60–63 (Boyd, J., concurring) (reasoning that statute cannot be sensibly applied

15

based on its own terms, resorting to canon of construction that statute depriving persons of common-law right must be strictly limited to its plain meaning and not applied in cases that do not clearly fall within scope of statute, and concluding that spectating at soccer match does not clearly fall within scope of this statute).

To date, the Court has not embraced the reasoning of the *Williams* plurality. Nor has our court. To our knowledge, only one Texas appellate court has done so. In *City of Madisonville v. Hernandez*, the Tenth Court of Appeals stated two alternate holdings, one of which was that flying an aircraft is not recreation under the statute because the enjoyment of nature or the outdoors is not integral to flight. No. 10-22-00151-CV, 2022 WL 17489755, at *7–8 (Tex. App.—Waco Dec. 7, 2022, pet. filed) (mem. op.). In support, the Tenth Court invoked the *Williams* plurality opinion in a *see also* citation but did not discuss the effect of its status as a plurality opinion. *Id.* at *8.

Plurality opinions are not binding precedent. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996); *Harris Cty. Hous. Auth. v. Rankin*, 414 S.W.3d 198, 202–03 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). When, as in *Williams*, a majority of the Supreme Court does not agree on the rationale for its judgment, "the judgment itself has very limited precedential value and would control the result only in identical cases." *Univ. of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 176–77 (Tex. 1994). The decision does not otherwise bind the

16

lower courts. *Id.* Under these circumstances, the holding of the Court—to the extent that there is a holding—consists of the position taken by those justices who concurred on the narrowest grounds. *Worthy v. Collagen Corp.*, 967 S.W.2d 360, 368 (Tex. 1998).

In *Williams*, the position taken by those justices concurring on the narrowest grounds, albeit for different reasons, was that spectating at a competitive-sports event is not recreation under the Recreational Use Statute. 459 S.W.3d at 54–55 (plurality op.); *id.* at 60–63 (Boyd, J., concurring); *see also Lawson v. Diboll*, 472 S.W.3d 667, 667 (Tex. 2015) (per curiam) (stating *Williams* "determined that the recreational use statute is inapplicable to spectators at outdoor competitive sporting events" and citing Justice Devine's plurality opinion and Justice Boyd's concurrence in support of this proposition). On its face, the Court's narrow holding is not dispositive of the present appeal, which turns on whether Fernandes's participation in a different outdoor activity, riding a waterslide at a public waterpark, rather than spectating at a competitive-sports event, is recreation under the statute.

We may, of course, rely on the reasoning of plurality opinions, like the one in *Williams*, to the extent we find that reasoning to be both on point and persuasive. *D.M. Diamond Corp. v. Dunbar Armored, Inc.*, 124 S.W.3d 655, 659 n.6 (Tex. App.—Houston [14th Dist.] 2003, no pet.). But in instances when we do so we must be careful to apply the Court's existing precedent as we find it, rather than predicting

17

whether the Court will embrace a view expressed by a plurality, because it is not the role of the courts of appeals to abrogate or modify the Court's precedent. *Lubbock Cty., Tex. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002).

Here, we conclude that *Williams* and this appeal are so dissimilar to one another as to make the *Williams* plurality's reasoning inapt. In *Williams*, the Court confronted a materially different scenario than the one before us. Namely, the Court had to decide whether an activity—spectating at a competitive-sports event—was encompassed by the Recreational Use Statute's catch-all provision concerning "any other activity associated with enjoying nature or the outdoors" when that activity did not resemble any of the activities expressly listed by the statute's laundry-list definition of recreation. *See* 459 S.W.3d at 49 (Devine, J., plurality op.) (identifying question as "whether the statute's recreational-activity list reasonably includes a spectator at a competitive-sports event" and agreeing with conclusion of court of appeals that "this activity was too dissimilar to the others on the list to be included" among those covered by statute's definition of recreation). In contrast, riding a waterslide into a catch basin or catch pool at a waterpark resembles two activities expressly included in the statute's definition of recreation: "swimming" and "water sports." TEX. CIV. PRAC. & REM. CODE § 75.001(3)(C), (K). This case does not involve a situation in which the activity at issue is too dissimilar to the ones expressly listed in the statute's definition to join them via the statute's catch-all provision.

18

Notably, all the justices who joined the Court's judgment in *Williams* agreed that to fall within the scope of the statute, any activity not expressly listed under the definition of recreation must bear some resemblance to one of those expressly listed. *See Williams*, 459 S.W.3d at 53–55 (Devine, J., plurality op.) (reasoning that statute must be read to encompass only activities similar to those expressly listed in definition of recreation); *id.* at 58 (Guzman, J., concurring) (agreeing that unlisted activities must be similar to those that are listed to fall within catch-all provision of statutory definition of recreation); *id.* at 60–62 (Boyd, J., concurring) (agreeing in principle that unlisted activities must be similar to those listed to qualify as recreation but concluding that listed activities are so varied that statute was difficult to decipher, and that spectating at a competitive-sports event does not clearly fall within language of catch-all provision of statute's definition of recreation). The mode of analysis we apply today comports with this majority view of the statute.

Fernandes argues that riding down a waterslide is outside the scope of recreation as defined by the statute by emphasizing the *Williams* plurality's additional reasoning that the catch-all provision's reference to "enjoying nature or the outdoors" necessarily limits its application to the enjoyment of "that part of the physical world that is removed from human habitation." *Id.* at 54 (Devine, J., plurality op.) (quoting from thesaurus to define terms "nature" and "outdoors"

19

because statute does not define these two terms). As we have noted, however, a majority of the Court did not embrace this position.

Moreover, we do not understand the plurality in *Williams* to have articulated a rationale as broad or bright-line as the one Fernandes advocates. The plurality reasoned that the enjoyment of nature or the outdoors is not essential to spectating in the same way that it is integral to playground activities, like sitting on a swing as addressed by the Court in *Torres*, because the former constitutes a celebration of organized human activity while the latter is a respite from organized human activity. *Compare Williams*, 459 S.W.3d 54 (Devine, J., plurality op.) ("Gathering together in a stadium to cheer a soccer team is not to remove oneself from human habitation but to embrace it; it is not the pursuit of nature but rather the celebration of organized human activity."), *with id.* at 55 ("In contrast, a park playground is not so much a celebration of organized human activity as it is a respite from it—a place where children can run, play, and otherwise enjoy the outdoors. The enjoyment of nature or the outdoors is thus a significant part of playground activity, but is not integral to the enjoyment of competitive sports."). Thus, unlike Fernandes, the plurality did not propose a simple distinction between activities occurring in areas of human habitation and those occurring outside of these areas. Rather, the plurality engaged in a more subtle inquiry, assessing the degree to which an activity not expressly listed in the statute reflected the kind of organized human activity associated with

20

civilization and thus cannot be said to be focused on the enjoyment of nature or the outdoors, which lie outside the ordered bounds of human settlement. *See id.* at 55 (concluding statute's catch-all provision did not encompass spectating at a competitive-sports event, as "the outdoors and nature are not integral to the enjoyment of this activity and because the activity is unlike the others the statute uses to define 'recreation'").

Accordingly, even if we were to employ the *Williams* plurality's reasoning here, this line of reasoning would not lead us to conclude that the Recreational Use Statute is inapplicable in this instance. Unlike spectating at a competitive-sports event at a stadium, riding a waterslide at a waterpark is not susceptible to characterization as a celebration of organized human activity. A waterpark is materially indistinguishable from a park playground, inasmuch as persons who gather there likewise do so to enjoy and divert themselves in an outdoor setting. A waterpark essentially is an aquatic playground. As the *Williams* plurality observed about playgrounds, a waterpark "is not so much a celebration of organized human activity as it is a respite from it—a place where children can run, play, and otherwise enjoy the outdoors." *Id.* at 55. Thus, as with playgrounds, the enjoyment of nature and the outdoors is a significant part of waterpark activity, unlike the enjoyment of competitive sports at a stadium. *See id.*

We conclude the Recreational Use Statute applies to Fernandes's claims.

21

### *Evidence of Gross Negligence*

Fernandes contends that even if the Recreational Use Statute applies to his claims, the trial court correctly denied the City's jurisdictional plea because he produced evidence creating a genuine issue of material fact as to whether the City acted with gross negligence. *See Garner*, 595 S.W.3d at 648 (statute effectively immunizes landowner from ordinary negligence claims when landowner allows others to use its land for certain types of recreational activities by requiring claimants to prove gross negligence, malicious intent, or bad faith to show immunity waived). In relevant part, Fernandes maintains that the record contains some evidence of conscious indifference on the City's part. He posits that even though the City understood the danger of allowing patrons to ride the waterslide when there is insufficient water in the catch basin, the City nonetheless signaled Fernandes to ride the slide knowing this was the case.

We disagree with Fernandes. No evidence exists that the City knew of the alleged danger but did not care or that any of the waterpark's employees acted with conscious indifference to the rights, safety, or welfare of others, including Fernandes. *See Suarez*, 465 S.W.3d at 634 (actor is grossly negligent when evidence shows it knew of danger but its acts or omissions demonstrate it did not care).

Assuming the evidence establishes the City knew that riding the Mat Racer waterslide when the catch basin is below the fill line poses a risk sufficient to satisfy

the first element of gross negligence, the City took steps to prevent this risk from materializing. *See id.* at 627 (gross negligence consists of two elements: (1) actor knew about condition of property giving rise to extreme degree of risk; and (2) actor proceeded with conscious indifference to rights, safety, or welfare of others). In the trial court, the City produced evidence, which is undisputed, showing that:

- the waterpark trains its lifeguards before they assume their duties, and this training includes instructing them not to allow patrons to ride the waterslide at issue unless the water in the catch basin at the bottom of the slide is at a specified level;

- the waterslide at issue is marked with a sign that specifies the level the water in the catch basin must be at before patrons may ride the slide, and the training the lifeguards receive also instructs them to position themselves facing this sign as a reminder; and

- before the accident involving Fernandes, the waterpark had not received any reports of physical injuries on the waterslide at issue, including injuries allegedly resulting from insufficient water in the slide's catch basin.

Taken together, this evidence demonstrates the City took measures to mitigate a known risk associated with the Mat Racer waterslide—the very one about which Fernandes complains in his suit—and had reason to think these measures were adequate to mitigate this risk, at least until Fernandes's accident possibly suggested otherwise. Unless it is controverted, this evidence shows the City was not consciously indifferent to the potential risk posed by the slide. *See City of Plano v. Homoky*, 294 S.W.3d 809, 817–18 (Tex. App.—Dallas 2009, no pet.) (holding undisputed evidence that municipal golf club considered safety of patrons relating

23

to placement of boards on floor and had not received complaints before guest was injured in trip-fall accident showed there was no question of material fact on gross negligence); *see also City of Cedar Park v. Delapena*, No. 13-21-00341-CV, 2022 WL 16993493, at *7–8 (Tex. App.—Corpus Christi Nov. 17, 2022, no pet.) (mem. op.) (concluding that implementation of safety rules and procedures and employment of trained lifeguards, among other acts, was evidence that city took substantial steps to ameliorate dangers posed by pool and was inconsistent with conscious indifference); *City of Conroe v. Thomas*, No. 09-18-00215-CV, 2018 WL 4924849, at *5 (Tex. App.—Beaumont Aug. 13, 2018, pet. denied) (mem. op.) (deciding that evidence that city had not received prior safety complaints about camp counselor who supervised indoor softball game and was not otherwise aware of any injury having happened during this type of camp activity sufficed to defeat allegations of gross negligence); *Lathem*, 476 S.W.3d at 109 (observing that boards that fell on child and injured her had been atop lockers for years without incident and concluding that under circumstances city did not disregard extreme degree of risk); *Howard*, 122 S.W.3d at 412 (indicating evidence university had not received prior complaints about diving board refuted allegation that diver's injury resulted from conscious indifference to risk posed by board).

Fernandes maintains that the preceding evidence is not uncontroverted. He argues that Stevenson, who manages the waterpark, evinced conscious indifference

on the day of the incident when she announced that patrons could get back into the water after the park's lightning detector no longer indicated the presence of lightning in the vicinity even though she knew the water on the slides had been turned off during the lightning alert. But even if true, this evidence is insufficient to establish gross negligence. There is no evidence the City knew the water level in the catch basin was empty or otherwise below the fill line when it instructed patrons that it was safe to return to the slides.

Stevenson testified that when the waterpark's lightning detector alert is triggered, "the lifeguards clear the water of all patrons, and then we stay out of the water until the lightning is out of range," as indicated by the detector. At the time, the park also turned off the water to the slides while a lightning alert was pending, a policy the park has since changed due to the incident involving Fernandes. Once an alert is over, Stevenson testified, all attractions are turned back on and management then notifies the patrons via loudspeaker that "it is safe to reenter the water and to be on the slide towers." On the day in question, Stevenson herself made this announcement.

Stevenson further testified that, before management makes this announcement, other managers walk the park to ensure that all is safe beforehand. These various managers communicate by radio during this process. On the day of Fernandes's accident, a manager by the name of Alyssa Garcia walked by the Mat

Racer—the waterslide in question—before communicating by radio it was safe to return. Based on the appellate record, it does not appear that the parties deposed Garcia. If the parties did depose Garcia, the transcript of her deposition is not in the record. The record contains no evidence as to what Garcia reported about the waterslide that day or the actions she took before the accident.

Fernandes argues the City knew it was unsafe for a patron to go down the Mat Racer slide "*if* the catch basin's water level is not above the safety line." He further argues, without any citation to the record, that the "City disregarded that risk and proceeded to dispatch Fernandes down the slide even though it knew there was little to no water in the catch basin." But there is no evidence in the record of this alleged contemporaneous knowledge. Indeed, there is no evidence the City knew, but disregarded, the water in the catch basin was below the fill line when the lifeguard signaled that Fernandes could go down the slide. The lifeguard's witness statement, which was admitted into evidence in opposition to the City's plea, reflects that the lifeguard working the waterslide's catch basin on the day of the accident reported that when "the water came back on," he "thought that meant it was okay to send people down." So, he "gave the thumbs up," and a waterpark employee at the top of the waterslide then "sent people down." It was only after these people had been dispatched that the lifeguard recognized there was a problem. Stevenson, who spoke to the lifeguard after the incident, testified that the lifeguard told her that "he noticed

26

that the guests were coming down faster than normal, and they had impacts at the bottom of the slide," at which point the lifeguard "blew his whistle to get help." This is not evidence that the lifeguard on duty was aware, when he signaled that it was okay to allow guests to ride the slide, that the water in the catch basin was below the fill line but disregarded that knowledge. While he was trained to check for the water level in the catch basin, at most, this evidence suggests he failed to do so. Such failure may amount to ordinary negligence, but it falls short of the elevated gross-negligence standard required under the statute. There is no evidence the City knew about the peril—that the water was below the fill line—but chose to move forward regardless in conscious indifference to the rights, safety, or welfare of Fernandes.

In sum, the evidence in the record indicates the City took active steps to avoid accidents by providing specific training to its lifeguards about the catch basin on the Mat Racer and placing signage concerning the fill line on the slide, signage which was present on the day of the accident. Stevenson announced to patrons that it was safe to return to the water and waterslides, including the one in question, only after other managers, Garcia in the case of the subject slide, communicated it was safe for patrons to do so. And even if Stevenson knew the water on the waterslides had been depleted when the alarm was triggered, there is no indication she had any knowledge that the catch basin in the relevant waterslide was low at the time she made the return to slide announcement. These circumstances do not give rise to an inference of

27

conscious indifference. On the contrary, the evidence once again demonstrates that the City took measures to mitigate a known risk associated with the waterslide—including the one at issue here: namely, insufficient water due to the slides being temporarily turned off during the pendency of the lightning alert—and had reason to think these measures were adequate to mitigate this risk, given the lack of previous accidents concerning the waterslide Fernandes rode.

Fernandes also argues the waterpark's change in policy—to no longer turn off the water to slides during lightning alerts—evidences conscious indifference. But he does not explain how the park's after-the-fact decision to alter its policies to prevent accidents like Fernandes's reflects on the park's state of mind before-the-fact, or more critically, at the time of his accident. The waterpark's recognition that the slide could and should be made safer to reduce the possibility of similar accidents recurring is not evidence of conscious indifference.

We conclude the record does not contain any evidence of gross negligence.

## CONCLUSION

We reverse the trial court's order denying the City's jurisdictional plea and render judgment dismissing this lawsuit for lack of subject-matter jurisdiction.


Gordon Goodman
Justice

Panel consists of Justices Goodman, Landau, and Rivas-Molloy.

28